STATE of Missouri, Respondent,

v.

Christopher SIMMONS, Appellant.

No. 77269.

Supreme Court of Missouri,
En Banc.

April 29, 1997.

Rehearing Overruled May 27, 1997.

Melinda K. Pendergraph, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Cassandra K. Dolgin, Assistant Attorney General, Jefferson City, for Respondent.

ROBERTSON, Judge.

A jury convicted Christopher Simmons of first-degree murder and recommended that he be sentenced to death for the abduction and murder of Shirley Crook. The trial court sentenced Simmons to death. Sim-mons appeals, raising numerous points challenging the propriety of his conviction and death sentence and his counsels' performance. Simmons filed a timely Rule 29.15 motion which the trial court overruled. This Court's exclusive appellate jurisdiction is founded on article V, section 3 of the Missouri Constitution. We affirm the judgment of conviction and sentence and the denial of relief under Rule 29.15.

## I.

### Facts

Simmons does not challenge the sufficiency of the evidence to support his conviction. We recite the facts only in sufficient detail to reconstruct the factual environment in which the legal issues arise.

In early September 1993, Christopher Simmons, then age 17, discussed with his friends, Charlie Benjamin (age 15) and John Tessmer (age 16), the possibility of committing a burglary and murdering someone. On several occasions, Simmons described the manner in which he planned to commit the crime: he would find someone to burglarize, tie the victim up and ultimately push the victim off a bridge. Simmons assured his friends that their status as juveniles would allow them to "get away with it." Simmons apparently believed that a "voodoo man" who lived in a nearby trailer park would be the best victim. Rumor had it that the voodoo man owned hotels and motels and had lots of money despite his residence in a mobile home park.

On September 8, 1993, Simmons arranged to meet Benjamin and Tessmer at around 2:00 a.m. the following morning for the purpose of carrying out the plan. The boys met at the home of Brian Moomey, a 29–year–old convicted felon who allowed neighborhood teens to "hang out" at his home. Tessmer met Simmons and Benjamin, but he refused to go with them and returned to his own home. Simmons and Benjamin left Moomey's and went to Shirley Crook's house to commit a burglary.

The two found a back window cracked open at the rear of Crook's home. They opened the window, reached through, unlocked the back door, and entered the house.

Moving through the house, Simmons turned on a hallway light. The light awakened Mrs. Crook, who was home alone. She sat up in bed and asked, "Who's there?" Simmons entered her bedroom and recognized Mrs. Crook as a woman with whom he had previously had an automobile accident. Mrs. Crook apparently recognized Simmons as well.

Simmons ordered Mrs. Crook out of her bed and, when she did not comply, Simmons forced her to the floor with Benjamin's help. While Benjamin guarded Mrs. Crook in the bedroom, Simmons found a roll of duct tape, returned to the bedroom, and bound her hands behind her back. The two also taped Mrs. Crook's eyes and mouth shut. They walked Mrs. Crook from her home and placed her in the back of her minivan. Simmons drove the van from Mrs. Crook's home in Jefferson County to Castlewood State Park in St. Louis County.

At the park, Simmons drove the van to a railroad trestle that spanned the Meramec River. Simmons parked the van near the railroad trestle. He and Benjamin began to unload Mrs. Crook from the van and discovered that she had freed her hands and had removed some of the duct tape from her face. Using Mrs. Crook's purse strap, the belt from her bathrobe, a towel from the back of the minivan, and some electrical wire found on the trestle, Simmons and Benjamin bound Mrs. Crook, restraining her hands and feet and covering her head with a towel. Simmons and Benjamin walked Mrs. Crook to the railroad trestle. There, Simmons bound her hands and feet together, hog-tie fashion, with the electrical cable and covered Mrs. Crook's face completely with duct tape. Simmons then pushed her off the railroad trestle into the river below. At the time she fell, Mrs. Crook was alive and conscious. Simmons and Benjamin threw Mrs. Crook's purse into the woods and drove the van back to the mobile home park across from the subdivision in which Mrs. Crook lived.

Later that day, Simmons went to Moomey's trailer and bragged to Moomey that he had killed a woman "because the bitch seen my face." In the meantime, Steven Crook, Shirley's husband, returned home from an overnight trip and discovered that his wife had not gone to work as scheduled. When he did not hear from his wife by that evening, he filed a missing persons report.

That same afternoon, two fishermen found a body floating in the Meramec River, three-quarters of a mile downstream from the railroad trestle. The fishermen notified authorities, who removed the body. The medical examiner identified the body from fingerprints, determined the cause of death as drowning and noted that the victim was alive prior to being pushed from the bridge. The examiner also reported that Mrs. Crook had sustained several fractured ribs and considerable bruising and that these injuries did not result from her fall from the railroad trestle.

The next day, September 10, police received information that Simmons was involved in the murder. They arrested Simmons at his high school and took him to the Fenton, Missouri, police department. Police read Simmons the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Simmons waived his constitutional rights and, after a little less than two hours of questioning, confessed to the murder. He also agreed to videotape a confession and to take part in a videotaped "reenactment" of the murder at the crime scene.

The Jefferson County prosecutor charged Simmons with first-degree murder, burglary, kidnapping and stealing. The trial court severed the last three charges for trial purposes. Simmons sought a change of venue. The trial court refused but agreed to transfer a jury from Cape Girardeau County into Jefferson County to hear the case due to the substantial publicity the crime had received in Jefferson County.

The jury found Simmons guilty of first-degree murder and recommended the death sentence. The trial court sentenced Simmons to death. Simmons filed a Rule 29.15 motion, which his appointed public defender amended in a timely fashion. Following an evidentiary hearing, the motion court overruled Simmons's Rule 29.15 motion. Sim-

mons appealed the conviction, his sentence, and the denial of post-conviction relief.

## II.

### Venue

■ Simmons contends that venue did not lie in Jefferson County, but rather in St. Louis County, and that the trial court erred in not transferring the case to St. Louis County or, alternatively, dismissing the charges. Although the burglary and abduction occurred in Jefferson County, Crook's death took place in St. Louis County and thus, Simmons argues, venue lies in St. Louis County.

For support, Simmons cites *State v. Harvey*, 730 S.W.2d 271 (Mo.App.1987). *Harvey* is inapposite. It holds that *jurisdiction* of a murder is properly *in the state* in which the defendant delivered the fatal wound or blow.

Venue of homicides is governed by section 565.001.4, RSMo 1994. *State v. Lingar*, 726 S.W.2d 728, 732 (Mo. banc 1987). That statute provides that, in instances where the offense is committed partly in one county and partly in another or where the elements of the crime occur in more than one county, the defendant may be prosecuted in any of the counties where any element of the offense occurred.

Appellate review of this question focuses on whether one can reasonably infer from the facts and circumstances that the crime occurred within the trial court's venue. *Lingar* at 732. The evidence shows that Simmons broke into Shirley Crook's home in Jefferson County, found her there, and believed she would recognize him because he had an automobile accident that involved Mrs. Crook. Simmons bound Mrs. Crook in Jefferson County, placed her in her van in Jefferson County, and drove to the railroad trestle spanning the Meramec River in St. Louis County, bearing the intent to kill her he had formed in Jefferson County.

Deliberation is an element of first degree murder. Section 565.020.1, RSMo 1994. This Court observed in *Lingar* that the conclusion that the defendant had deliberated the crime within a county is sufficient to establish venue in that county under section 565.001.4. *Lingar*, 726 S.W.2d at 732. *See also Leisure v. State*, 828 S.W.2d 872, 879 (Mo. banc 1992) (finding that deliberation and premeditation within St. Louis City made venue proper although death occurred outside the city limits).

From the evidence, it is reasonable to conclude that Simmons deliberated the crime in Jefferson County. This finding is sufficient to establish venue in Jefferson County under section 565.001.4. The point is denied.

## III.

### Jury Selection

#### A.

■ Simmons assigns error to the trial court's decision to sustain the state's challenges for cause to two venirepersons who expressed a discomfort with and uncertainty about the death penalty, claiming a violation of his Sixth Amendment right to an impartial jury.

When a prospective juror's views on the death penalty would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath," *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), the trial court may exclude the juror for cause. The trial court must determine whether the views expressed by a prospective juror will prevent or substantially impair performance of a juror's duties, subject to appellate review for abuse of discretion. On review, the trial court is afforded great deference because of its superior ability to "interpret and evaluate a venireman's answers and demeanor." *State v. Leisure*, 749 S.W.2d 366, 374 (Mo. banc 1988).

Venireperson Judith Fluegge indicate that her father was a minister, that his teachings emphasized that "it's wrong to take someone's life," and that she would be very uncomfortable considering the death penalty as a punishment option. At her moment of greatest assurance about her ability to impose the death penalty—a moment brought about by defense counsel's attempt to qualify her for the jury—Ms. Fluegge said that she would be willing to listen to evidence as to

why she should consider the death penalty and that she could "possibly" consider imposing the death penalty.

Venireperson Laura Hecht also expressed reservations about the death penalty, doubting her ability to concentrate on the evidence with the possibility of participating in a penalty phase deliberation involving the death penalty awaiting her. Her strongest commitment to considering the full range of penalties came when she said in response to defense counsel's inquiry that she "possibly could, yes" consider the death penalty.

We discover no abuse of the trial court's discretion in its decision to sustain the state's challenges for cause to these two venirepersons on the basis of their indecision and, specifically as to Ms. Hecht, on account of her doubts about her ability to concentrate on the evidence. The points are denied.

### B.

■ During voir dire, the state asked:

"Is there anybody here for the sole fact of the defendant's age could not sit in judgment in this case?"

"You're not saying that just because of his age you would never consider [the death penalty]? You would be able to at least consider it?"

"And is your position that because of the Defendant's age, you could not consider both punishments?"

"I'm not saying that you shouldn't be able to consider a person's age. What I'm saying is would that totally exclude for you any possibility of considering a sentence of death."

Simmons claims that these questions and statements about his age and their affect on a venireperson's ability to sit in judgment over him in both the guilt and penalty phases violate the Eighth Amendment to the United States Constitution. Simmons claims that such questioning suggested that age was not a proper mitigating factor and could not be used as a basis for deciding against imposing the death penalty. Simmons further argues that the prosecutor sought a commitment from the jurors to impose the death penalty. Review is for abuse of discretion.

In *State v. Richardson*, 923 S.W.2d 301 (Mo.banc 1996), the trial court dismissed potential jurors because they would not consider the death penalty on account of the defendant's age. Richardson claimed that these dismissals were improper because age is a legitimate statutory mitigating factor. This Court upheld the dismissals, noting the difference between the consideration of mitigating circumstances, which jurors must do, and a flat refusal to consider the full range of punishment, which is grounds for disqualification. *Id.* at 309. Simmons contends that his case is distinguishable because the state led the jurors to believe that they should not consider age at all.

The state's questions and statements explore the issue whether the venirepersons would be able to perform their duties as jurors—whether they would be able to sit in judgment during the guilt phase and whether they would be able to consider the full range of punishment during the penalty phase because of the defendant's age. It remains the law that both the defendant and the state are entitled to a fair jury. Contrary to Simmons's argument, the state's voir dire questions and statements do not suggest that the defendant's age cannot be considered; in fact, the prosecutor expressly rejected that position. Instead, the state's inquiries asked whether a potential juror would place too much weight on defendant's age when considering the facts and, ultimately, the appropriate punishment. Nor do the statements seek a commitment to vote for the death penalty.

*Richardson* controls. The trial court did not abuse its discretion in allowing the questions. The point is denied.

### IV.

### Confession

Simmons contends that he confessed involuntarily and that he should have a new trial. He claims this despite his receipt of *Miranda* warnings and his waiver of the rights the warnings protect. He maintains his Fifth Amendment rights were violated because he was subjected to interrogation despite his announcement of his intent to remain silent;

he also asserts that he was coerced into confessing by intimidation and promises of leniency.

The *Miranda* warnings are "prophylactic." *Duckworth v. Eagan,* 492 U.S. 195, 203, 109 S.Ct. 2875, 2880, 106 L.Ed.2d 166 (1989). They are a judicial creation designed to "assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process," *Miranda,* 384 U.S. at 469, 86 S.Ct. at 1625, despite an "interrogation environment [that] is created for no purpose other than to subjugate the individual to the will of his examiner." *Id.* at 457, 86 S.Ct. at 1619.

 The test for whether a confession is voluntary is whether the totality of the circumstances created a physical or psychological coercion sufficient to deprive the defendant of a free choice to admit, deny or refuse to answer the examiner's questions. *State v. Lytle,* 715 S.W.2d 910, 915 (Mo. banc 1986). On appeal, the evidence pertaining to the admissibility of appellant's confession is reviewed in the light most favorable to the trial court's ruling. *State v. Debler,* 856 S.W.2d 641, 650 (Mo. banc 1993). Any conflicts in the evidence are for the trial court to resolve, and this Court will defer to the trial court's superior position from which to assess credibility. *Lytle,* 715 S.W.2d at 915.

According to the evidence adduced at the preliminary hearings and at trial, police arrested Simmons at his high school and drove him to the Fenton police headquarters. No questioning occurred at the time of the arrest nor during the journey to police headquarters. Upon arrival, Detectives Knoll, Elia, and Milano took Simmons into an interrogation room. Using a department form, Knoll read Simmons the warnings *Miranda* requires. Simmons initialed the rights on the form, indicating that he understood those rights. Simmons then signed a waiver of the rights the *Miranda* warnings are designed to protect, and the detectives commenced the interrogation. This initial interrogation was not electronically recorded.

The initial interrogation session lasted approximately two hours. At first, Simmons denied any knowledge of the crime. The detectives occasionally raised their voices and moved within close proximity (a foot) of Simmons's face. Knoll told Simmons that he thought Simmons was lying. The detectives also suggested that Simmons's accomplice, Charles Benjamin, had been arrested and was possibly confessing at that moment.

At some point during the interrogation, Lt. Edward Robertson, head of the major case squad, entered the room. He told Simmons that he was facing either the death penalty or life in prison and that it would be in his "best interest" to tell the truth. After Robertson left, Knoll and the other detectives encouraged Simmons to remember what Robertson had said and that it would be better for him to tell the truth.

Eventually, Simmons asked everyone but Detective Knoll to leave the room. Simmons confessed. Simmons then agreed to permit videotaping of his confession. Prior to his videotaped confession, Simmons again received the *Miranda* warnings and again Simmons waived his constitutional rights.

### A.

 Simmons acknowledges that the officers read him the *Miranda* warnings at least twice, and that each time, he indicated that he understood those rights and waived them. The fact that a defendant is repeatedly read the *Miranda* warnings, and voluntarily waives his rights, weighs in favor of a finding that the defendant voluntarily confessed. *State v. Lytle,* 715 S.W.2d 910 (Mo. 1986). Simmons, however, contends that the detectives conducting the investigation violated these rights by continuing to question him after he had indicated his intent to exercise his right to remain silent.

 After receipt of the *Miranda* warnings, "if the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda,* 384 U.S. at 473–474, 86 S.Ct. at 1627. A person has a right under the Fifth Amendment to "cut off questioning" and this right must be scrupulously honored. *Michigan v. Mosley,* 423 U.S. 96, 103, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). The suspect, however, must give "a clear, consistent expression of a

desire to remain silent" in order to invoke his rights adequately and cut off questioning. *United States v. Thompson,* 866 F.2d 268, 272 (8th Cir.1989).

Nowhere in the record is there any direct testimony—from Simmons or anyone else—as to anything Simmons said or did that would constitute a "clear, consistent expression of a desire" to assert his Fifth Amendment rights and remain silent. The bulk of the evidence in the record pertinent to this issue consists of Simmons stating that he understood his rights, that he waived those rights, and that he confessed freely and voluntarily. Because Simmons received and understood the *Miranda* warnings, he also knew and understood that he had the right to stop the interrogation at any time. The record shows without equivocation that among the rights that Simmons initialed and indicated he understood was the following:

> If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

Simmons, although aware of this right, never exercised it. At trial, defense counsel asked Detective Knoll the following questions during cross-examination:

Q. You advised Chris of his rights?

A. Yes, sir, I did.

Q. And you told him that he didn't have to talk to you?

A. Yes, I did.

Q. Did he have any problems—did he say, "I don't want to talk to you?"

A. No.

Q. Did he freely sign those forms?

A. Yes, he did.

Q. And he freely started to talk to you?

A. Yes, he did.

Q. And what did he tell you at first?

A. He said he didn't have any involvement in the crime.

Q. Well, did he terminate the interview at that point in time?

A. No, he did not.

The only evidence Simmons cites in support of his claim is a statement that Detective Knoll made at the beginning of Simmons's videotaped confession. The statement upon which Simmons relies follows an exchange in which Detective Knoll shows Simmons the advice-of-rights form and confirms that the form had been read to him; that Simmons understood it; and that Simmons had initialed and signed the *Miranda* waiver. Detective Knoll then observed that the investigation had been going on for some two hours and said: "During the time all of this [the interrogation] has been going on, you first started off saying you didn't know nothing about this crime, and you didn't want to tell us anything. Is that correct?"

This single, isolated statement hardly establishes that Simmons made a clear, consistent expression of a desire to remain silent. Read in context, Detective Knoll's statement refers to Simmons's initial denial of involvement in the crime, not any assertion of the Fifth Amendment right to remain silent. Furthermore, at trial, when directly asked by the defense whether Simmons ever sought to terminate the questioning, Detective Knoll denied that Simmons had. Viewing the record as a whole, we find no substantial, credible evidence that Simmons ever asserted his right to terminate the questioning and remain silent.

**B.**

■ Simmons also claims that Detective Knoll threatened to use Simmons's silence against him, in violation of his Fifth Amendment rights. Detective Knoll allegedly told Simmons that if he did not tell the truth and confess, Knoll would testify about Simmons denying any involvement in the crime.

As evidence supporting his claim, Simmons points to the following from the deposition of Detective Knoll:

> Question: Did you discuss with [Simmons] in what ways his failure to give a statement could hurt him?
>
> Answer: Well, we just told him that if he chose to lie, which I believed he was, not to tell the truth, that if it went to court then I would get on the stand and I would testify

that he sat there during the whole interrogation, and denied his involvement in the case.

■ This colloquy does not show an intent by Detective Knoll to use Simmons's *silence* against him. Rather, Knoll said that he would use Simmons's *statements* against him—his denials of involvement in the crime. A denial of involvement in the crime is not an invocation of one's right to remain silent. *State v. Pollock*, 603 S.W.2d 614, 620 (Mo. App.1980); *State v. Burley*, 523 S.W.2d 575, 578 (Mo.App.1975).

In telling Simmons that he would testify that Simmons denied involvement in the case, Knoll also indirectly reminded Simmons that anything Simmons said could be used against him in court. Knoll did not mislead Simmons as to the scope of the rights *Miranda* protects, nor did Knoll's statements infringe Simmons's right to remain silent.

### C.

■ Simmons also contends that he confessed in exchange for a promise of leniency. Simmons claims that the detectives made an implied promise of leniency when they told him that he could possibly face the death penalty and that it would be better for him if he told the truth.

■ A confession resulting from a direct or indirect promise of leniency is inadmissible. *State v. Chandler*, 605 S.W.2d 100, 116 (Mo. banc 1980). However, officers' statements to a suspect that cooperating is in his or her best interests are not improperly coercive and do not, as a matter of law, render a confession involuntary. *Bannister v. Armontrout*, 4 F.3d 1434, 1440 (8th Cir. 1993); *State v. Klueg*, 781 S.W.2d 133, 136 (Mo.App.1989); *State v. Wilson*, 755 S.W.2d 707, 709 (Mo.App.1988); *State v. Dixon*, 655 S.W.2d 547, 556 (Mo.App.1983). *See also U.S. v. Ruggles*, 70 F.3d 262, 265 (2nd Cir. 1995); *United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir.1978) (finding that encouraging a suspect to tell the truth does not, as a matter of law, render the confession

involuntary, even where the suspect is only sixteen years old).

There is no indication on this record that the detectives made any promise whatsoever to Simmons. They simply told him that it was in his best interest to tell the truth. Simmons tries to create an implied promise by linking the statements that it would be in his best interest to tell the truth to Robertson's statement that he was possibly facing the death penalty. We find this supposed nexus far too tenuous to support Simmons's contentions. "If defendant had a hope of leniency, that hope 'springs from the seeds of his own planting [and] is not sufficient to render the resulting confession inadmissible.'" *State v. Schnick*, 819 S.W.2d 330, 336 (Mo. banc 1991).

### D.

■ Simmons also contends that under the totality of the circumstances, his confession must be found involuntary. In determining whether a confession resulted from improper mental coercion, the court considers factors such as age, experience, intelligence, gender, lack of education, infirmity, and unusual susceptibility to coercion, but no one fact is dispositive. *State v. Lytle*, 715 S.W.2d at 915. Simmons reminds the Court that he was 17 years old at the time of the interrogation, a not-too-successful high school student, possessed of a low intelligence quotient and likely did not understand his constitutional rights, despite his assurances to the contrary at the time of the interrogation.

The record shows that authorities interrogated him for nearly two hours. Simmons claims the detectives used impermissibly coercive tactics to wrench a confession from him. Among those coercive tactics were yelling, "getting in his face," and misleading him about whether his accomplice Charlie Benjamin was making a statement implicating him.[1] The totality of these circumstances rendered Simmons's *Miranda* waiver involuntary, he now contends.

---

1. Simmons also incorporates his prior arguments as evidence of improper police coercion,

but we have already found above that the police did not engage in improper activity.

Viewing the evidence in the light most favorable to the trial court's decision, we do not find, under the totality of the circumstances, that Simmons was deprived of a free choice to admit, deny or refuse to answer the detectives' charges, nor that he was subjected to such psychological coercion that his will was overborne at the time he confessed. The questioning was not unduly long; it lasted approximately two hours. Although the detectives "got in his face," no detective ever touched Simmons nor was he ever threatened with any physical harm. The detectives made neither promises nor threats. Although Simmons was told he could face the death penalty, such a statement does not constitute a threat but is a permissible observation of the possible consequences of first degree murder. *See, e.g., United States v. Scurlock*, 52 F.3d 531 (5th Cir.1995) (finding that a truthful, non-coercive statement of the possible penalties an accused faces does not overbear the accused's free will). As for suggesting that his accomplice, Charlie Benjamin, was contemporaneously giving a statement implicating him, this tactic does not, *per se*, render Simmons's confession involuntary. Confessions obtained by falsely leading an accused to believe an accomplice has made statements implicating the accused are admissible. *State v. Flowers*, 592 S.W.2d 167, 169 (Mo.1979).

We find no error in the trial court's decision to admit Simmons's confession. The points are denied.

## V.

### Detective Knoll's Testimony

Simmons claims the trial court denied his rights to due process and a fair trial because the trial court allowed Detective Knoll to offer his opinion as to Simmons's truthfulness and to testify as to whether Simmons expressed any remorse for the crime.

### A.

On redirect, the prosecutor asked Detective Knoll whether he believed that the final version of the story that Chris Simmons gave him was "the absolute truth." Simmons's counsel objected to the question on the grounds that the question would invade the province of the jury to determine Simmons's veracity. The prosecutor argued that he was trying to rebut the defense's cross-examination, which sought to establish that Knoll never actually knew what "the absolute truth" was, but rather considered anything Simmons told him to be "the absolute truth" as long as those statements implicated Simmons in the crime. The trial court sustained the objection. The prosecutor rephrased the question, asking:

> Q. Detective, after your investigation of this case, and knowing all the things you now know, do you believe that Chris Simmons told you everything about what he did?

The trial court overruled the defense's objection to the new question, and Detective Knoll responded, "No, I do not."

Despite Simmons's claim to the contrary, the second question and Knoll's answer are not improper comments by Knoll on Simmons's veracity. Knoll's statement focuses on whether he believed there was more Simmons could have said in his confession.

In any event, there is no prejudice. There is ample evidence to support Simmons's conviction. Simmons's own words are sufficiently damning to make Knoll's statements inconsequential.

Moreover, it would make little sense for Knoll to question Simmons's credibility when Simmons's own confession is the strong, nearly impregnable foundation of the state's case. The point is denied.

### B.

Simmons also takes issue with Detective Knoll's testimony on redirect that Simmons never said he was sorry. Simmons contends this testimony was irrelevant and immaterial to the issue of guilt, and the trial court abused its discretion in allowing the testimony.

On cross-examination, the defense established through Detective Knoll that Simmons cried on several occasions during his confession. On redirect examination, the prosecutor asked:

Q. Detective Knoll, I'll ask you again, defense counsel asked you if the Defendant was crying. At any time, did he ever say he was sorry?

A. No, he did not.

■ In response to an objection, the prosecutor claimed that he addressed the question of Simmons's remorse, or lack thereof, to rebut the possible inference of remorse the jury might have made from the fact that Simmons was crying. The determination of the scope of rebuttal is within the trial court's discretion and, absent an abuse of such discretion, the trial court's decision will not be reversed. *State v. Hamilton,* 892 S.W.2d 371, 379 (Mo.App.1995).

While it is not clear that the defense raised the issue of remorse by injecting evidence of the defendant's lacrimation, we cannot say that the admission of Knoll's testimony on rebuttal—absent any showing of prejudice and in light of the overwhelming evidence supporting the conviction—rose to the level of an abuse of discretion that requires reversal. The point is denied.

## VI.

### "Voodoo Man" Testimony

Simmons claims that the trial court erred during the guilt phase in allowing two witnesses to testify regarding Simmons's plans and preparations to steal from and murder a neighborhood resident known as the "voodoo man." This testimony, according to Simmons, constituted evidence of prior bad acts, was not offered for any of the recognized exceptions to the evidentiary rule that excludes evidence of other crimes, and was both irrelevant and highly prejudicial.

#### A.

The first mention of the "voodoo man" at trial came from Christie Brooks, who testified that Simmons came by her house about five hours prior to the break-in at Shirley Crook's residence and told her that he and two others were going to rob the "voodoo man." Defense counsel did not object to Christie Brooks's testimony and, on appeal, Simmons requests plain error review.

In *State v. Brown,* 902 S.W.2d 278, 284 (Mo. banc 1995), we said:

[U]nless a claim of plain error facially establishes substantial grounds for believing that "manifest injustice or miscarriage of justice has resulted," this Court will decline to exercise its discretion to review for plain error under Rule 30.20. We will, however, consider related claims of ineffective assistance of counsel for failure to preserve the alleged trial error under the test of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Simmons's point does not raise a substantial ground for finding plain error on its face.

#### B.

■ Additional and more detailed testimony regarding the plot to rob the voodoo man arose later in the trial when John Tessmer testified. Defense counsel had filed a motion in limine regarding Tessmer's testimony about the voodoo man, which the trial court overruled. Defense counsel offered a continuing objection to the testimony at trial, which was also overruled.

Tessmer testified that Simmons talked about a plan to murder someone because he wanted "a bunch of money." Simmons told Tessmer he would throw the victim off a bridge and had the "voodoo man" in mind. Simmons discussed the plan with Tessmer three to five times during the early part of September. The voodoo man was always the intended victim whenever Simmons discussed his plan with Tessmer. Simmons also discussed the plan with Tessmer and Charlie Benjamin while at Brian Moomey's house, saying that he wanted to kill someone and "get a bunch of money" by tying them up and throwing them off a bridge or by tying the victim to a tree and getting the victim's bank card.

Tessmer also testified that he observed Simmons making masks out of sweatshirts so the voodoo man would not see their faces. About four days prior to Shirley Crook's murder, Simmons allegedly asked Charlie Benjamin to help them kill somebody, according to Tessmer. Tessmer said that

about three days before the murder, he saw ropes and gloves at Simmons's house.

On September 8, Simmons told Tessmer that he wanted to meet him and Charlie Benjamin at Brian Moomey's house at 2:00 a.m. the following morning for the purpose of committing the murder. Tessmer met Simmons at Brian Moomey's house but did not go with him to Shirley Crook's house. Tessmer did not believe that Simmons was actually intending to rob and murder someone that night. Tessmer also testified that Simmons did not have any weapons, masks, or other equipment with him that night.

▮▮▮ The trial court has broad discretion to exclude or admit evidence at trial. This Court will reverse only upon a showing of a clear abuse of discretion. *State v. Parkhurst*, 845 S.W.2d 31 (Mo. banc 1992). A trial court's admission of irrelevant and immaterial evidence, even of other crimes, will not be reversed on appeal absent a showing of prejudice. *State v. Ellis*, 853 S.W.2d 440, 445 (Mo.App.1993). Tessmer's testimony is not other crimes testimony. It speaks directly to Simmons's motive and the deliberateness of his general plan to steal and murder. On that basis it is admissible. Nevertheless, and assuming for the sake of argument only that Tessmer's testimony should have been excluded, we do not find that its inclusion prejudiced Simmons in light of the other, overwhelming evidence of Simmons's guilt.

This case is not at all like *State v. Sladek*, 835 S.W.2d 308 (Mo. banc 1992), on which Simmons relies. In *Sladek*, it was *explicitly* clear that the trier of fact (in that case, the court), relied on the uncharged transgressions to convict Sladek. When sentencing Sladek, the trial court said that the state had a very weak case, that absent the evidence of Sladek's uncharged transgressions the trial court would not have found Sladek guilty, and that if the evidence of the uncharged transgressions should not have come in, then Sladek's conviction should be reversed on appeal. *Id.* at 310–11.

In sum, Simmons has made no showing of prejudice that flowed from the testimony of John Tessmer. We find no abuse of discretion on the part of the trial court in overruling the defense's motion in limine and continuing objections at trial regarding John Tessmer's testimony.

## VII.

### Improper Closing Argument During Guilt Phase

▮▮▮ Simmons assigns error to the trial court's failure to correct the prosecutor's closing argument during the guilt phase. Of the errors claimed, only one was properly preserved for review.

During the guilt phase of the trial, the prosecutor argued:

> The evidence is uncontroverted. Uncontroverted. The evidence of plotting, the evidence of burglary, the evidence of premeditation, the evidence of binding, the evidence of blindfolding, transporting, of murder. I'm going to ask you to go back, and render a verdict of guilty of murder in the first degree. You're never going to get to the other verdict because there was premeditation. This wasn't sudden passion. This wasn't an accident. Premeditation, binding and transporting. Render that verdict *so we can get on with the rest of the trial.*

Defense counsel objected to the highlighted portion of the argument. The trial court overruled the objection. Simmons claims that the argument improperly refers to the punishment phase of the trial without giving the defense an opportunity to address the argument. Simmons relies on *State v. Maxie*, 513 S.W.2d 338, 345 (Mo.1974), for the proposition that if punishment is discussed in closing arguments, the discussion should occur in the opening portion of the state's argument so that defense counsel has an opportunity to respond to that argument. Simmons also contends that the prosecutor's statement is contrary to the instructions of the court because the prosecutor argued that the jury should hurry in its deliberations.

▮▮ The trial court's ruling will not be overturned absent an abuse of discretion resulting in prejudice to the defendant. *State v. Mahurin*, 799 S.W.2d 840 (Mo. banc 1990). An abuse of discretion exists only where the

prosecutor's statements are plainly unwarranted and clearly injurious to the defendant. *Id.*

Reading the prosecutor's statements in context, we do not believe that the prosecutor is urging the jury to hurry its deliberations or inviting the jury to consider punishment prematurely. At most, the prosecutor's argument is an inartful attempt to summarize the overwhelming and undeniable evidence of guilt. The point is denied.

## VIII.

### Media Coverage

Simmons contends he was denied due process, a fair trial, and his right to confront witnesses because the trial court allowed cameras in the courtroom to cover the proceedings over Simmons's objection. Simmons claims he was prejudiced because the presence of the cameras may have affected the testimony of the State's witnesses, particularly Shane Knoll and Brian Moomey.

██ Electronic media coverage of criminal trials does not constitute a *per se* denial of due process. *Chandler v. Florida,* 449 U.S. 560, 574, 101 S.Ct. 802, 809-10, 66 L.Ed.2d 740 (1981). The defendant must produce evidence that the media coverage of his case "had an adverse impact on the trial participants sufficient to constitute a denial of due process." *Id.* at 581, 101 S.Ct. at 813. Simmons has not produced such evidence nor does his argument offer more than hopeful speculation. The point is denied.

## IX.

### Disclosure of Witness Arrest Records

██ Simmons contends he was deprived of a fair trial because the trial court refused to order the disclosure of the arrest records of all of the state's witnesses. As a result, Simmons claims, he could not effectively cross-examine the state's witnesses regarding their biases, prejudices, or motives to lie on the stand.

Rule 25.03 designates certain types of information that the state must disclose to the defendant. If the information sought by the defendant does not fall within any of these categories, the defendant may make a written motion to the court requesting the state to disclose the information under the terms of Rule 25.04. If the court finds the request reasonable, the court will order the state to disclose the information to the extent the court finds it relevant and material to the defendant's case.

In reviewing claims regarding meaningful discovery in a criminal trial, this Court looks to see whether there was a reasonable likelihood that the denial affected the result of the trial. The trial court's refusal to require disclosure will be overturned only if it appears that the trial court abused its discretion to the extent that fundamental unfairness to the defendant resulted. *State v. Mease,* 842 S.W.2d 98, 108 (Mo.banc 1992).

██ In this case, Simmons requested that the trial court order the state to disclose the prior criminal history or "rap sheets" of all state witnesses. Simmons admits that the trial court sustained Simmons's motion as to prior convictions,[2] but claims that the court refused to order the state to disclose the "rap sheets" or similar information regarding prior arrests that did not lead to convictions.[3] Simmons sought this information in order to impeach the witnesses' credibility. While generally, one may not impeach a witness's credibility by showing an arrest, investigation or criminal charge that has not resulted

2. We note that a court order is not necessary to obtain prior convictions as these are required to be disclosed under Rule 25.03(A)(7).

3. It is not clear what the trial court ordered disclosed in this regard. The trial court initially indicated that it would sustain Simmons's motion. The parties then discussed whether arrest records are discoverable or only prior convictions. The court then told the State "to summarize prior criminal history, but not to provide the original rap sheet." Mr. Crosby, for the defense, argued that the entire rap sheets were discoverable, although not necessarily admissible. The Court responded, "I'll stand on that for now" and called a recess. Upon return, the Court stated that it "had sustained [the motion for disclosure by Court order] as to the prior criminal history." The scope of "criminal history" is never defined.

in a conviction, a party can use such evidence if the inquiry would demonstrate either (1) a specific interest of the witness; (2) the witness's motivation to testify favorably for the state; or (3) that the witness testified with an expectation of leniency. *State v. Wise*, 879 S.W.2d 494 (Mo. banc 1994).[4] Even for such purposes, a witness's arrest record would only be relevant to the extent there are any *pending* charges; past arrests, investigations, or charges would not be relevant to show *present* motivation to testify favorably for the state. *See, e.g., State v. Joiner*, 823 S.W.2d 50, 53 (Mo.App.1991) (distinguishing between the potential relevancy of pending charges and the irrelevancy of past charges).

For the purpose of impeachment, it appears that Brian Moomey is the only witness whose arrest records could have possibly been material or relevant to Simmons's case, assuming, of course, that those records would have revealed any pending charges. The trial court's apparent decision not to require disclosure of Moomey's arrest records is not an abuse of discretion, however, because there is simply no grounds for believing that the non-disclosure had any palpable effect on the outcome of the trial. Simmons confessed to the murder, and thus there was ample evidence of his guilt. As for impeaching Moomey's testimony, the defense established that Moomey had spent time in prison for assault with a weapon, burglary and stealing; that he drank heavily—indeed, admitted passing out almost every night, and that he had told the witness coordinator that he was afraid to testify because "people were investigating [him] for the murder, and the investigator was focusing on [him] as being involved in the death of Shirley Crook." Evidence of other of Moomey's illegal activities could hardly have had a negative impact on the jury's view of his character given what they already knew. Moreover, the record reflects ample opportunity to cross-examine the witnesses, and there is no evidence indicating that a "fundamental unfairness" resulted

from the trial court's decision not to require disclosure of Moomey's entire rap sheet. The point is denied.

## X.

### Reasonable Doubt Instructions

Despite nearly ten years of case law contrary to his position, Simmons doggedly raises the consistently-raised-but-to-date futile challenge to the validity of instructions based on MAI–302.04 and 313.30, claiming that the "firmly convinced" language in the instructions lowers the state's burden of proof, thereby depriving Simmons of due process. This Court has upheld the "firmly convinced" language in *State v. Chambers*, 891 S.W.2d 93 (Mo. banc 1994); *State v. Parker*, 886 S.W.2d 908 (Mo. banc 1994); *State v. Williams*, 871 S.W.2d 450 (Mo. banc 1994); *State v. Harris*, 870 S.W.2d 798, 811 (Mo. banc 1994); *State v. Shurn*, 866 S.W.2d 447, 462 (Mo. banc 1993); *State v. Ramsey*, 864 S.W.2d 320 (Mo.banc 1993); *State v. Griffin*, 848 S.W.2d 464, 469 (Mo. banc 1993); *State v. Ervin*, 835 S.W.2d 905, 924 (Mo. banc 1992); *State v. Blankenship*, 830 S.W.2d 1, 13 (Mo. banc 1992); *State v. Twenter*, 818 S.W.2d 628, 634 (Mo. banc 1991); *State v. Waller*, 816 S.W.2d 212 (Mo. banc 1991); *State v. Wacaser*, 794 S.W.2d 190, 195 (Mo. banc 1990); *State v. Murray*, 744 S.W.2d 762, 771 (Mo. banc 1988); *State v. Antwine*, 743 S.W.2d 51, 63 (Mo. banc 1987); *State v. Bowman*, 741 S.W.2d 10, 15 (Mo. banc 1987); *State v. Sandles*, 740 S.W.2d 169, 175 (Mo. banc 1987); and *State v. Guinan*, 732 S.W.2d 174, 178 (Mo. banc 1987). The point is denied.

## XI.

█ Simmons alleges that the trial court erred in overruling his motion to strike the "depravity of mind" aggravating circumstance and in overruling his objection to Instruction 16, which submitted that aggravating circumstance to the jury. Simmons

---

**4.** The state argues that Simmons was not entitled to disclosure because he failed to show that any of the above exceptions apply. This argument puts the cart before the horse. The exceptions address whether such information is admissible, not whether it is discoverable. The entire purpose of discovery of arrest records is to determine whether the witness had a motivation to testify favorably for the state or had an expectation of leniency. Admissibility issues arise only after the defense offers evidence that it found through discovery.

contends that the depravity of mind aggravating circumstance is unconstitutionally vague and that he is entitled to a new sentencing hearing because of its allegedly erroneous use.

The depravity of mind aggravator was submitted to the jury as follows:

4. Whether the murder of Shirley Crook involved depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman. You can make a determination of depravity of mind only if you find:

That the defendant killed Shirley Crook after she was bound by defendant and that defendant thereby exhibited a callous disregard for the sanctity of all human life.

This language is similar, in all material respects, to the "depravity of mind" aggravator at issue in *State v. Tokar*, 918 S.W.2d 753, 772 (Mo. banc 1996).[5] In *Tokar*, this Court determined that "the jury was specifically provided guidance on when they could find this aggravating circumstance." This Court has held that language and limiting instructions such as that in this case and in *Tokar* provide sufficiently narrow parameters to guide the jury and that the instruction is not constitutionally vague. *Id. State v. Mease*, 842 S.W.2d 98, 113 (Mo. banc 1992), *cert. denied*, 508 U.S. 918, 113 S.Ct. 2363, 124 L.Ed.2d 269 (1993); *Sidebottom v. State*, 781 S.W.2d 791, 799 (Mo. banc 1989), *cert. denied*, 497 U.S. 1032, 110 S.Ct. 3295, 111 L.Ed.2d 804 (1990). The point is denied.

## XII.

### Rule 29.15 Issues

Simmons's Rule 29.15 motion contains numerous claims of ineffective assistance of trial counsel. We have exercised our discretion not to permit plain error review where counsel failed to preserve an alleged error for appellate review and the request for plain error review does not establish substantial grounds of prejudice on its face. Consistent with *State v. Brown*, we have reviewed each of the claims of ineffective assistance carefully and determined that those claims not individually addressed below offer no grounds upon which a reasonable probability of prejudice to Simmons from counsels' acts or failures to act could be founded. Because an individual analysis of these claims would carry no precedential value, they are denied without further discussion. Rule 84.16(b).

▮▮▮▮ To prevail on a claim of ineffective assistance of counsel, the movant must establish by a preponderance of the evidence "that counsel failed to exercise the customary skill and diligence that a reasonably competent attorney would perform under similar circumstances, and that he was prejudiced thereby." *Moore v. State*, 827 S.W.2d 213, 215 (Mo. banc 1992); *Strickland v. Washington*, 466 U.S. 668, 687–89, 104 S.Ct. 2052 2064–65, 80 L.Ed.2d 674 (1984). Prejudice exists where there is a reasonable probability that the outcome of the proceeding would have been different but for counsel's ineffectiveness. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. Where trial counsel decides as a matter of trial strategy to pursue one evidentiary course to the exclusion of another, trial counsel's informed, strategic decisions not to offer certain evidence is not ineffective assistance. *Leisure v. State*, 828 S.W.2d 872, 875 (Mo. banc 1992). A motion court's determination will be overturned on appeal only if it is clearly erroneous. *State v. Whitfield*, 939 S.W.2d 361, 369 (Mo. banc 1997).

### A.

▮▮▮ Simmons claims that trial counsel was ineffective in failing to object during guilt phase closing argument when the state said

Well, in that struggle [with Shirley Crook], [Simmons] won, but in this struggle he's not going to win because this struggle goes beyond what happened on September 9th of 1993. This struggle goes to what goes on every day in society. We have to take a stand and take control of our streets. [They're our] streets, [they're our] homes.

5. The only difference is that the aggravator in *Tokar* read "bound or otherwise rendered helpless."

If we can't be protected in our homes, we can't be protected anywhere. *Do you think he wants you protected in your home?*

(Emphasis added.)

 Simmons argues that the highlighted portion of the argument constitutes an improper personalization of the crime to the jury. It is, of course, improper for a prosecutor to suggest personal danger to the jurors or their families if the defendant should be acquitted. *State v. Storey,* 901 S.W.2d 886, 901 (Mo. banc 1995); *State v. Santonelli,* 914 S.W.2d 13, 15 (Mo.App.1995).

The prosecutor's statement is a vague and ill-defined, near-non sequitur. It does not suggest personal harm to the jurors if Simmons is acquitted. In *Storey,* the state asked the jurors to put themselves in the victim's shoes and imagine the crime happening to them. *Storey,* 901 S.W.2d at 901. The prosecutor's statement here is substantially less personal than the argument condemned in *Storey.* Moreover, Simmons makes no showing or reasonable argument that the statement had a decisive effect on the outcome of the trial, given the evidence of Simmons's guilt.

 Simmons also maintains that the entire argument as set out above was an argument outside the record to which his counsel should have objected. Simmons does not explain this claim sufficiently well for us to grasp its focus. Nevertheless, assuming that Simmons's argument is that the statement alleges that society's struggle with crime goes on every day, we have previously said that the prosecutor may argue the prevalence of crime in the community and may call on common experience in doing so. *State v. Clemmons,* 753 S.W.2d 901 (Mo. banc 1988).

 Simmons goes on to assert that the argument is impermissible because prosecutors may not urge a conviction in order to protect community values or deter future lawbreaking. Simmons is incorrect. The state may argue that the jury should send a message that society will not tolerate certain conduct. *State v. Cobb,* 875 S.W.2d 533, 537 (Mo. banc 1994).

**B.**

 Simmons also claims trial counsel was ineffective in failing to object to the prosecutor's guilt-phase argument that "[n]o matter how obviously guilty, he has a right to a fair trial. Folks, he had his day in court. The Judge has taken every precaution." Simmons argues that the statement is an improper comment about the prosecutor's opinion of Simmons's guilt, and that such a statement plays on the jury's susceptibility to believe the prosecutor, suggests the prosecution's possession of undisclosed matters relating to the crime, and undermines the jury's discretion.

 The prosecutor may make statements that draw a legitimate inference from the evidence but may not make statements that imply a knowledge of facts not before the jury. *State v. Whitfield,* 837 S.W.2d 503 (Mo.1992). The statement "no matter how obviously guilty" merely suggests that the evidence adduced at trial supports a finding of guilt; the statement does not suggest knowledge of outside facts, but highlights Simmons's own confession.

 Simmons claims ineffective assistance of counsel resulted when the prosecutor referred to him as a "predator" and suggested he possessed an "evil mind" and trial counsel did not object. It is not error for a prosecutor to characterize a defendant and his criminal conduct as long as the evidence supports such a characterization. For example, in *State v. Carson,* 883 S.W.2d 534 (Mo.App.1994), the court did not fault the defense for failing to object to the prosecutor's characterization of the defendant as a "thug and bully." The court observed that the evidence showed that the victim was "jerked back real quick," hit in the back and shoved to the ground. This conduct, the court found, was "the work of a thug and bully." *Id.* at 536.

In this case, a reasonable person could find the deliberate, premeditated murder of Shirley Crook by throwing her from a bridge the work of a predatory person with evil motives. This is simply not a case where the prosecutor ascribed labels to the defendant that were totally unsupported by the evidence, as

in *State v. Whitfield,* 837 S.W.2d 503 (Mo. 1992) (finding insufficient evidence to label homicide defendant as a "mass murderer" and a "serial killer"), or where the prosecutor injected evidence of unrelated crimes, as in *State v. Burnfin,* 771 S.W.2d 908 (Mo.App. 1989). The motion court did not err in overruling Simmons's Rule 29.15 motion on these points relating to guilt phase closing argument.

### C.

 Simmons claims that his trial counsel was ineffective in failing to investigate and present evidence during the penalty phase relating to abuse Simmons suffered as a child, his alcohol and drug abuse, his mental illness, and threats made by Brian Moomey to Simmons and his family following Simmons's arrest.

At the crux of Simmons's claim of ineffective assistance of trial counsel is the role of Dr. Daniel Cuneo. The Rule 29.15 hearing record shows that Simmons's counsel employed Dr. Cuneo to complete an evaluation as to Simmons's competency, sanity, and to determine the presence of mitigating factors for use in the penalty phase. Simmons claims that his attorneys' decision not to present evidence of Simmons's physical abuse at the hands of his stepfather, psychological abuse resulting from his bitterly divorced parents, and his own abuse of alcohol and drugs was not an informed decision. Simmons characterizes his attorneys' actions as a failure to investigate and concludes that a strategic decision that is not informed is not a strategic decision at all. Much of Simmons's claim in this regard results from his belief that there was serious miscommunication between his attorneys and Dr. Cuneo. He claims that Dr. Cuneo assumed that the attorneys would provide him all of the relevant evidence necessary to formulate an opinion as to the presence of psychologically-based mitigating circumstances. He also claims that the attorneys assumed that Dr. Cuneo would conduct an independent investigation and would not rely solely on information provided by Simmons's attorneys.

It appears from our review of the record that the attorneys initially believed that ab-sent compelling psychological evidence that might explain Simmons's homicidal behavior, Simmons stood a better chance with the jury if the penalty phase evidence attempted to play on the jury's sympathy and the impact on Simmons's family should he be put the death at the hands of the state. Dr. Cuneo's work—at least as it regarded mitigating circumstances—was designed to determine whether such compelling psychological evidence existed.

The motion court found Simmons's counsel thoroughly investigated Simmons's background.

Mr. Crosby [one of the two trial counsel] indicated that he interviewed many individuals in preparation for Movant's defense. He testified that he interviewed one of Movant's counselor's [sic] at school, the principal and the assistant principal of Movant's school, Movant's parents, Movant's grandparents, a cousin, step-brothers, the father of Beth Simmons, Robert Hayes' sister, Joe Tesmer, Christy Brooks and Chris Brown. He indicated that he reviewed the school records of Movant and learned that his grades were not good and that his absenteeism was high and that several times [sic] disciplinary actions was [sic] imposed upon Movant. Mr. Crosby also indicated that he on several occasions spoke with an attorney, Mr. John Counts, who represented Charles Benjamin, a co-defendant in the criminal case.

Mr. Crosby indicated he learned of Movant's use of marijuana and alcohol. He testified that the Movant's involvement in his use of marijuana and alcohol were not considered by him to be significant enough to demonstrate any impact on Movant's state of mind. . . .

Mr. Crosby testified that while Movant was in custody he met with him fifteen to twenty times and averaged one hour per visit. Movant denied to Mr. Crosby that Robert Hayes [movant's stepfather] abused him. . . .

\* \* \* \* \* \*

Mr. Burton [one of the two trial counsel] testified that he mailed sixty letters to the individuals named by Movant. He testi-

fied that he had interviewed Movant four or five times and he interviewed Movant's parents and several of his friends. He testified that he spoke with several of Movant's school teachers and with one former employer through that employer's attorney.

In addition, Dr. Cuneo testified at the Rule 29.15 hearing about his conversations with Simmons's attorneys.

> A. [by Dr. Cuneo, upon cross-examination by the State] They asked me what my perceptions were. One of the things is that they were worried that his history of alcohol and drug abuse may not be helpful. My perceptions of Christopher at that time was he had borderline traits and his accounting to me of the alleged offense, I had stated was quite cold and they felt that if I thought that some of the mitigating factors would be important, i.e., the fact of his possible relationship with Brian Moomey; the fact of calling them Thunder Cats, the fact of having a kiddy gang that very well may have been supporting him although we never had any hard data on that; also the perception that the way he accounted the crime to me, or his accounting of the alleged offense or crime to me was extremely cold and that would not be in his best benefit to have that done. So we talked n I guess we talked for about an hour and hour and a half [sic] on the phone as to whether in fact I should pursue anything else. And they stated no. I called back later before trial to see if we wanted to and it was their decision at that point that there were some things that were bad that I could say. The bad that I could say would outweigh what I could say that could be helpful.

The decision not to pursue the psychological evidence was founded on Dr. Cuneo's initial report that identified no compelling mitigating circumstance. The motion court found:

> Mr. Burton outlined his plan for the penalty phase of trial. He indicated that he wanted to counter what the State's evidence was and to appeal to the sympathies of the jury and ensure the jury knew Movant was only seventeen. He intended to present the Movant as one who was liked or loved by his brothers, his mother, his father and Christy Brooks. He also sought the perspective testimony of other friends, school teachers or former employers but learned that none of them could offer anything substantive. In fact, some appeared to be intimidated by the charge pending against Movant and were unwilling to discuss anything positive about him. The plan included the intention to present Movant as a seventeen year old individual who had not yet had the opportunity to develop a series of good deeds but to some extent did do good for one of his age. Another objective was to present some of Movant's family to demonstrate their sorrow in contemplating the possible recommendation of death. Mr. Burton believed that if the jury chose not to like Movant, they may choose to like his family and spare Movant's life for the family's benefit.

> \*　　\*　　\*　　\*　　\*　　\*

> Mr. Burton indicated that a decision was made to present no evidence regarding Movant's drug or alcohol use. He testified that he learned there was no alcohol consumed or drugs used at the time of the crime. Mr. Burton also learned of the strained relationship between Movant and his step-father. He indicated he believed that any information regarding this relationship would serve to work against Movant and therefore a decision was made not to present any of that evidence during the mitigation phase.

This strategic decision is made all the more reasonable when one considers—as did the motion court—the testimony offered by Dr. Robert Smith in support of Simmons's position at the Rule 29.15 hearing. After administering a battery of tests to Simmons and his parents and stepfather, and after extensive interviews with Simmons and with persons familiar with Simmons's upbringing, Dr. Smith determined that Simmons had a borderline personality disorder and a schizotypal personality disorder. Missouri juries

considering the death penalty have often rejected such testimony as the sort of compelling, psychological mitigating evidence that warrants a life sentence. *See, e.g., State v. Kreutzer,* 928 S.W.2d 854 (Mo. banc 1996) (jury recommends death penalty despite psychological testimony that defendant suffered from post-traumatic stress disorder and borderline personality disorder as a result of past emotional and physical abuse); *State v. Parker,* 886 S.W.2d 908 (Mo. banc 1994) (jury recommended death sentence after mental health expert testified to defendant's borderline personality disorder); and *State v. Duisen,* 428 S.W.2d 169 (Mo. banc 1967) (jury recommended death sentence after hearing evidence that defendant had a schizophrenic reaction of the paranoid type and anti-social behavior). Simmons's experienced trial counsel, no doubt aware of the likelihood of the success of the psychological evidence, chose a strategy they believed might give Simmons's better chance for a life sentence. That the strategy was not successful does not render its use ineffective assistance of counsel.

Simmons argues that *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), requires the trial counsel to offer mitigating evidence of childhood abuse and severe emotional disturbance when the defendant is youthful. Despite Simmons's claim to the contrary, *Eddings* does not require that such evidence be placed before the jury during the penalty phase. In *Eddings,* the constitutional error was not the failure to put on mitigating evidence but the failure of the sentencing court to consider it. Where trial counsel makes a reasoned decision not to place such evidence before the jury during the penalty phase, *Eddings* does not announce a *per se* rule mandating the submission of mitigating evidence solely because of a defendant's youth.

The motion court did not clearly err in denying Simmons's claims of ineffective assistance of counsel on this point.

### D.

During the penalty phase, Mrs. Crook's husband, Steven, testified:

But she was terrifically scared of height. It terrifies me to think of her being blindfolded and knowing that she was—because I feel that they would have talked about where they were going, and to be thrown off of a high spot would be really a terrible thing for her to—and then how she would feel about not being home when I come home. I know that as much pain as she would have been going through, I know she would have been worried about me, and worried about Kim and Randy and her mother. Her mother was ill.

Mrs. Crook's daughter, Kimberly Hawkins said:

Like I said, I have dreams. I dream about how she—how I imagine she felt during all of this, what she thought. I can't imagine what she went through, the terror that she felt. I just—I have a picture in my mind that she can't see, she can't speak, she can't scream out, she can't get her hands on anybody, she's tied up, she's naked. You know, she never wanted to be unclothed. It just tore her down emotionally. Threw her in a van. I just imagine—I can imagine her feelings—you know—I can imagine that—I'm sure they were talking.

I can imagine that she was being pushed over, and the freeness of the air. There's nothing below you, there's nothing holding you up. I can't imagine the terror that she's thinking, what's happening, what's going on, I can't see anything. Then I imagine her hitting the water. Does she know to take a breath? Does she know that's what was going to happen. Then you hit the water, and then you go in. And then if she had a breath that she held, how long could she hold it? Did it hurt? When the water came in, did it hurt?

Mrs. Crook's sister, Purdy Mitchell, read a prayer she had prepared and delivered at the family's first Thanksgiving after Mrs. Crook's murder.

Dear God, we come together to remember, to celebrate and give thanks. You have given us the gift of each other, and the love we share that you have planted

in our hearts. By your gracious hand, we have received all that we have for our love and our hope and faith. We are grateful. We humbly ask you to grant your special graces to our family. May our homes be a place of peace and love and faith. We ask you, Dear God, to protect and bless all of us absent and present, living and dead. We wanted to put something in there that would kind of say Shirley without saying her name. Please bless this food, and bless us who are gathered here. In the name of Jesus, Amen.

Simmons claims his counsel was ineffective in failing to object to this testimony of the victim's family and that this failure resulted in a violation of Simmons's Eighth and Fourteenth Amendment rights.

### 1.

■ *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), reversed the holdings of *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and *South Carolina v. Gathers,* 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), that the Eighth Amendment forbids the admission of victim impact evidence during the penalty phase of a capital trial in every instance. *Payne* expressly limited its holding to victim impact evidence. Because the evidence in *Payne* did not extend to the victim's family's characterizations of and opinions about the crime, the Supreme Court did not reconsider *Booth's* holding that such evidence likewise violates the Eighth Amendment. *Payne,* 501 U.S. at 830, n. 2, 111 S.Ct. at 2611, n. 2.

The Supreme Court's Eighth Amendment jurisprudence has not beaten an easily-followed path, as the transition from *Booth* to *Gathers* to *Payne* shows. Pre-*Booth* decisions focus the Eighth Amendment inquiry on concerns "that the sentencing process should facilitate the responsible and reliable exercise of sentencing discretion" by the jury. *Caldwell v. Mississippi,* 472 U.S. 320, 328–29, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985). *Payne,* authored for the Supreme Court by Chief Justice Rehnquist, seems to reject Eighth Amendment concerns about re-

liability expressed in *Caldwell,* at least as to matters of evidence introduced at the sentencing phase. *Payne* adopts the view of then-Justice Rehnquist's *Caldwell* dissent that "there is no [Eighth Amendment] requirement that all information received by a sentencing jury be 'relevant.'" *Id.* at 351, 105 S.Ct. at 2651 (Rehnquist, J., dissenting).

Thus, it appears that post-*Payne*-Eighth-Amendment analysis applies to those situations in which penalty phase procedures operate to diminish the jury's sense of responsibility for its decision to impose death, *Caldwell,* or where the sentencer's discretion is not "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Zant v. Stephens,* 462 U.S. 862, 874, 103 S.Ct. 2733, 2741, 77 L.Ed.2d 235 (1983). After *Payne,* reliability concerns that attach to matters of evidence during the penalty phase are considered under a due process rubric. "In the event that evidence is introduced that is so unduly prejudicial that it renders that trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne,* 501 U.S. at 825, 111 S.Ct. at 2608. Simmons's Eighth Amendment argument is denied.

### 2.

■ Simmons claims that counsels' alleged ineffectiveness resulted in a violation of his right to due process. The test of a due process violation, as the preceding paragraph notes, is whether the evidence is so prejudicial that it renders the trial fundamentally unfair.

The evidence in this case did not offend the due process clause. Though an Eighth Amendment case, *Payne* makes clear that "there is nothing unfair about allowing a jury to bear in mind that harm [the defendant's acts had caused] at the same time as it considers the mitigating evidence introduced by the defendant." *Id.* at 826, 111 S.Ct. at 2609.

It is an affront to the civilized members of the human race to say that at sentencing in a capital case, a parade of witnesses may praise the background, character and good deeds of Defendant ... without limi-

tation as to relevancy, but nothing may be said that bears upon the character of, or the harm imposed, upon the victims.

*Id., quoting State v. Payne,* 791 S.W.2d 10, 19 (Tenn.1990). Moreover, Justice O'Connor's concurring opinion suggests that in light of "the jury's unavoidable familiarity with the facts [of the murder]," witness testimony at the sentencing phase describing the loss suffered by the victim's family does not violate due process where the statements of the witnesses do not inflame the passions of the jury beyond the passion that the facts of the crime itself inflames. *Payne,* 501 U.S. at 832, 111 S.Ct. at 2612 (O'Connor, J., concurring).

Steven Crook spoke about his wife's fear of heights and the terror that she must have felt. No one doubts that the jurors were moved by this testimony. But the jurors had already heard from Christopher Simmons himself about her abduction; the way she was bound; the manner in which she was thrown into the minivan; her struggle to free herself; Simmons's use of her own clothing and personal items to hog tie her; his decision to use duct tape to cover her face, restrict her breathing, and blind her. The jury would have known that she knew she was on railroad tracks because she had freed herself earlier and realized that a trestle lay ahead. As human beings, the jurors would have imagined the scene and felt what Shirley Crook felt as she struggled and fought for breath and was thrown and fell to her death. We doubt that Steven Crook could inflame the jurors more than Christopher Simmons did in his confession of the murder.

Kimberly Hawkins's testimony described the impact of the manner of her mother's death on her. She did not describe the crime. She described the nightmares that came to her as part of her description (not fully set out in this opinion) of the broad impact her mother's murder had on her ability to work and rest and enjoy life. This, too, would have affected the jury. But this is "evidence of the specific harm caused by the defendant." *Payne,* 501 U.S. at 825, 111 S.Ct. at 2608. In this case, it is also evidence that balances the mitigation evidence put on by Simmons at the penalty phase—that his

death at the hand of the state would injure *his* family. " '[J]ustice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true.' " *Payne,* 501 U.S. at 827, 111 S.Ct. at 2609, *quoting Snyder v. Massachusetts,* 291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed. 674 (1934).

Likewise, Purdy Mitchell's testimony spoke of the Shirley Crooks family's loss. This, too, is harm caused by the murder of which the jury may know. We do not find that her reading of the prayer rendered the sentencing phase of the trial fundamentally unfair when considered in the context of the statutory and nonstatutory mitigating and aggravating statutory circumstances presented by both parties during the penalty phase.

The motion court did not err in overruling the Rule 29.15 motion on these points.

**E.**

 During the penalty phase closing argument, defense counsel argued

> I'll submit to you this: If you, as you sit here today, say to yourself, "You know, as far as Chris Simmons is concerned, the State's right; who cares about age; who cares about no significant history; who cares about the deeds he's done." You basically may say to yourself, "I don't care about Chris Simmons at all," and I'm not at all saying to you that that's the feeling you should have. You've heard all the good things that were said about a seventeen year old kid. Ladies and gentlemen of the jury, if, in fact, you do feel that way about Chris Simmons, then I'm not asking you here to render a life sentence for this kid over here. I'm asking you to give a life sentence *for his family.* Family and friends that basically have indicated to you, and shown you that a life sentence that you render is not the same in their eyes as the death penalty.
>
> Now, there's no question the State will come up here and say, "Well, you know, Chris Simmons is the one that did everything to his family." Don't you feel responsible for that situation, ladies and

gentlemen of the jury, but all I'm saying to you is consider his family. Consider his brothers. Consider the fact that just the fact that he's alive makes a difference to some people, and that, ladies and gentlemen of the jury, is certainly a mitigating circumstance that you should consider.

In response, the state's counsel argued

Look at what his friends and family told you. Isn't that scary? Look at how he repaid their love. Look at what he's done to them, and they're asking you to spare his life so he can remain in prison as a constant reminder to them of the acts he did on that night. Show some mercy to his family, give him death. Look at his family. Look at his little brother. Kenny said it all. Someday I want to grow up to be just like him. To be just like him. Spare those kids of that.

Simmons's counsel did not object. Simmons insists this is ineffective assistance of counsel and contends that this argument offends the due process clause as interpreted by the Eighth Circuit's decision in *Antwine v. Delo,* 54 F.3d 1357 (8th Cir.1995). The state says that the prosecutor's words are acceptable retaliation. Both arguments are incorrect.

Although we doubt the rectitude of the Eighth Circuit's due process conclusions in *Antwine,*[6] the application of that court's due process analysis in this case does not lead to a reversal.

In *Antwine,* the state's lawyer argued that (1) the death by gas chamber was instantaneous, (2) that the taxpayers of the state ought not be required to support Antwine for "the next 50 years" in prison, and (3) it would be more humane to put Antwine to death "so that his brother can get on with his life, and so that the two children can get on with their lives" than to require them to think about their brother/father in prison every day. *Id.* at 1362–3. The Eighth Circuit found it con-

stitutionally significant that death by cyanide inhalation was not instantaneous and, as a result, the state's first comment diminished the jury's sense of responsibility by assuring Antwine a quick and easy death. "On this basis [the Eighth Amendment] alone, we hold that Antwine's sentence is constitutionally invalid." *Id.* at 1362.

After announcing this sufficient basis for its holding, a "separate basis for our holding" follows. *Id.* at 1364. The Eighth Circuit characterized the additional issue it addressed as whether the latter two comments (summarized in the preceding paragraph), **"combined with** the misleading and unsupported description of instantaneous death, were prejudicial enough to render the entire sentencing proceeding fundamentally unfair and a violation of Antwine's right to due process." (Emphasis added.) *Id.* at 1363.

Continuing, *Antwine* embraced a due process analysis that requires consideration of four factors.

We must: (1) measure the type of prejudice that arose from the argument; (2) examine what defense counsel did in his argument to minimize the prejudice; (3) review jury instructions to see if the jury was properly instructed; and (4) determine if there is a reasonable probability that the outcome of the sentencing phase would have been different, taking into account all of the aggravating and mitigating circumstances.

*Id.* at 1363.

Under the *Antwine* rubric, the state's comment was improper—even as retaliation—because " 'it does not reflect the properly considered circumstances of the crime or the character of the individual.' " *Antwine,* 54 F.3d at 1364, *quoting Blair,* 916 F.2d 1310, 1323 (8th Cir.1990). Using the Eighth Circuit's language, the state's comment here was also "prejudicial,"[7] but not necessarily out-

---

**6.** *See Antwine v. State,* 791 S.W.2d 403 (Mo. banc 1990).

**7.** This Court, however, has reserved use of the word "prejudicial" to mean outcome determina-

tive. "Prejudicial" as we use it means a conclusion that trial error results in a reasonable likelihood that the jury would have reached a different result in the absence of the error. *State v. Parker,* 856 S.W.2d 331, 333 (Mo. banc 1993).

come determinative.[8]

■ It does not follow, however, that the state's comment requires a reversal of the death sentence. First, it is the combination of the instantaneous death argument—an Eighth Amendment violation—with the economic burden argument that offends the Eighth Circuit's constitutional sensibilities. In reaching its "separate basis" for reversal of the death sentence in *Antwine,* the court said

> There is no doubt that Antwine killed Eric "George" Jones in the police holding cell, but the two aggravating circumstances presented to the jury were balanced by some nonstatutory mitigating circumstances that could have led the jury to choose life imprisonment *if the prosecutor had not fed their fears of economic burden while easing their conscience with the idea of a quick, humane death."*

(Emphasis added.) Contrary to Simmons's assertion, *Antwine* does not rest on the state's comments about the defendant's family.

Second, we apply *Antwine's* four-stepped due process inquiry. (1) The state's challenged comment did not diminish the jury's sense of responsibility in imposing the death sentence. The state's argument focused the jury on the harsh reality of a death sentence on Simmons's family. This is the ground upon which defense counsel's strategy asked that the debate take place. That the state had a contrary view of what was best for the family did not diminish the jury's sense of the stark choice it faced. In fact, it heightened it. (2) Defense counsel raised the issue of the impact of the death sentence on Simmons's family initially in an attempt to persuade the jury that the family would suffer if the defendant died at the state's hand. The state's counterpoint must be read against Simmons's counsel's argument. When that is done, one cannot say that the jury deliberated without the benefit of a balanced argument. (3) The jury received instructions that reminded it that argument is not evidence. And as to the state's argument about what

would be best for Simmons's family, nothing the state said could be misconstrued by the jury as factual evidence. The argument condemned in *Antwine* alluded to a factual basis for the belief that incarceration for life held an economic burden for taxpayers that the death penalty would relieve. (4) We find no reasonable probability that the jury would have reached a different decision on punishment if the state had not said the words Simmons now challenges. The state's argument falls into the *Blair* exception—constitutional foul without constitutional harm. In our parlance, we conclude that no prejudice to defendant resulted from the state's argument.

### F.

■ During the penalty phase closing argument, the prosecutor said:

> Now, the Defendant is [sic] offered certain mitigating circumstances. The Court has instructed you that once you find those aggravating circumstances, which you have to find beyond any doubt—the evidence is overwhelming—that's a given—do those mitigating circumstances outweigh the four aggravating circumstances of what the Defendant has done to the victim and her family? You saw two stark contrasts this morning between the two families obviously in pain.
>
> There's one huge, enormous difference. His witnesses had to look at him when they testified. His witnesses get to visit him whether it's on Wednesdays or Sundays. His witnesses still have him. Shirley's don't. They don't have Wednesday visitation. They don't have Sunday visitation, and they certainly couldn't look at her in the courtroom. That's their cross that they are bearing. That's his choice. *He chose the evidence that you are going to hear in this case. He chose it.*

(Emphasis added.) Simmons asserts that the emphasized portion of the argument (the only portion Simmons's brief quotes) is a prejudicial, indirect comment on his decision

---

8. *See Antwine,* 54 F.3d at 1363. ("[W]e found no due process violation when the prosecutor made a single, brief comment, even though that comment was so improper and prejudicial that we had 'no hesitation in condemning [it],' " *quoting Blair,* 916 F.2d at 1323.

not to testify in the case, a violation of the Fifth and Fourteenth Amendment right to remain silent. Defense counsel did not object. Was this ineffective assistance, as Simmons claims?.

We do not read the prosecutor's statement as a comment on Simmons's failure to testify. Read in context, the prosecutor's statement reflects a belief that Simmons chose to murder Shirley Crook and to do so in the manner in which he did. The prosecutor's argument places the blame for the pain and loss that both Simmons's family and the Crook family bore on Simmons's decision to commit murder. We find no intent to speak to Simmons's failure to testify in the state's argument, and thus no error. Therefore, counsel cannot be ineffective where the state's argument conformed to the law.

## XIII.

### Section 565.035.3 Review

Section 565.035.3, RSMo, requires this Court to determine

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found;

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

### A.

Simmons claims that the death penalty recommended by the jury and imposed by the trial court in this case was the result of the influence of passion, prejudice, or arbitrary factors. He claims that the victim impact evidence, the prosecutor's closing argument, and the prosecutor's alleged assertion that Simmons's age was an aggravating and not a mitigating factor all require a reversal of the death penalty. We have pre-

viously considered these claims. They are without merit.

■ In addition, Simmons's now claims that the jury's inability to hear evidence of his child abuse, psychological and emotional damage, drug and alcohol addiction, and his relationship with the felon, Brian Moomey, rendered the imposition of the death penalty arbitrary. We have previously determined that Simmons's counsels' decision not to focus on this evidence during the penalty phase was a reasonable strategic decision. Section 565.035.3 review does not require reversal of the death sentence because a reasonable strategic decision does not result in the outcome the defendant prefers.

### B.

Simmons contends that the evidence is insufficient to support the jury's finding of the statutory aggravating circumstances. He bases this argument on the grounds that his confession was illegally obtained. Absent the confession, there would be no evidence that he had murdered Shirley Crook either for pecuniary gain or to avoid lawful arrest. As discussed previously, Simmons's confession was not illegally obtained. Thus, there was ample evidence to support finding the two statutory aggravators in question.

As to the depravity of mind aggravator, Simmons again contends that this is unconstitutionally vague. Again, as we previously determined, the aggravator was not unconstitutionally vague and there was ample evidence to find that Simmons killed Shirley Crook after she had been bound. Simmons's arguments are meritless.

### C.

Simmons claims that this Court's practice of proportionality review violates due process. This Court rejected a similar claim recently in *State v. Ramsey*, 864 S.W.2d 320 (Mo. banc 1993), *cert. denied*, 511 U.S. 1078, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994). The point is denied.

### D.

Simmons next claims that the imposition of the death penalty is arbitrary because it is

the product of unrestricted prosecutorial discretion. This Court rejected a similar argument in *State v. McMillin*, 783 S.W.2d 82 (Mo. banc 1990), *cert. denied*, 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990). We continue to adhere to the views expressed in *McMillin*.

### E.

Simmons also claims that Missouri's death penalty statute achieves no legitimate governmental goal and is therefore excessive. This Court rejected this argument is *State v. Newlon*, 627 S.W.2d 606 (Mo. banc 1982), *cert. denied*, 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149, *reh'g denied*, 459 U.S. 1024, 103 S.Ct. 391, 74 L.Ed.2d 520 (1982). The point is denied.

### F.

#### Proportionality

 In considering whether the death sentence imposed in this case is proportionate, we consider the death sentence imposed in other cases. The jury found three aggravating circumstances: that Simmons committed the murder for pecuniary gain, section 565.032.2(4); that Simmons committed the murder to avoid a lawful arrest, section 565.032.2(10); and that the murder involved depravity of the mind.

Where a murder has been committed for pecuniary gain and/or for the purpose of avoiding identification of the defendant by the victim, this Court has upheld the death sentence in *State v. Copeland*, 928 S.W.2d 828 (Mo. banc 1996); *State v. Kreutzer*, 928 S.W.2d 854 (Mo. banc 1996); *State v. Nunley*, 923 S.W.2d 911 (Mo. banc 1996); *State v. Weaver*, 912 S.W.2d 499 (Mo. banc 1995); and at least six other cases. In *State v. Tokar*, 918 S.W.2d 753 (Mo. banc 1996), the death penalty was recommended where the defendant exhibited depravity of mind by killing the victim while the victim had been bound. *See also State v. Oxford*, 791 S.W.2d 396, 402 (Mo.1990) (finding depravity of mind where the murder victim was bound and gagged with duct tape and beaten.) The death penalty has also been given in cases involving youthful offenders. *State v. Wil-*kins, 736 S.W.2d 409 (Mo. banc 1987), and *State v. Richardson*, 923 S.W.2d 301 (Mo. banc 1996).

The death penalty imposed in this case is proportionate to the sentence imposed in similar cases. The point is denied.

### XIV.

The judgment of guilt of first degree murder, the sentence of death and the judgment overruling the defendant's Rule 29.15 motion are affirmed.

All concur.