STATE of Missouri, Respondent,

v.

Steven LOVE, Appellant.

No. WD 51311.

Missouri Court of Appeals,
Western District.

Nov. 25, 1997.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Jan. 27, 1998.

Application for Transfer Denied
March 24, 1998.

Rebecca L. Kurz, Asst. Appellate Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before SMART, P.J., and LOWENSTEIN and LAURA DENVIR STITH, JJ.

LAURA DENVIR STITH, Judge.

Appellant Steven Love appeals his convictions for first degree murder, kidnapping, forcible rape, and armed criminal action. He alleges various errors by the trial court in limiting the defense's DNA expert from presenting certain exhibits and from testifying concerning the results of her alternative methodology of analyzing DNA evidence. He also asserts error in permitting the State to impeach her credibility by presenting evidence of her bills for testifying in other cases. We find the court's rulings to be well within its discretion in controlling the admission of expert testimony. We also reject Mr. Love's challenges to the sufficiency of the evidence. There was more than adequate evidence that he kidnapped, raped, and killed the victim. We similarly find no plain error in the admission of certain hearsay testimony and certain testimony relating to the credibility of Mr. Love's expert, none of which testimony was objected to by defense counsel. Finally, we consider and reject Mr. Love's claim that his counsel was ineffective in failing to object to certain hearsay testimony of one of the police officers and that, therefore, the motion court erred in denying his Rule 29.15 motion without an evidentiary hearing. Mr. Love cannot turn unpreserved error into reversible error by arguing incompetence of counsel. For all of these reasons, we affirm the conviction and affirm denial of Mr. Love's post-conviction motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On the evening of October 26, 1992, Christine Field and Ruth Kindermann spent the evening watching rented videos at Jamie McKim's house in Kansas City. At approximately 3:30 a.m. on the morning of October 27, 1992, Ms. Field and Ms. Kindermann decided to leave and go back to Ms. Field's house. Ms. Field led the way in her car, and Ms. Kindermann followed in her burgundy 1986 Pontiac Grand Am.

When they reached the intersection of 43rd and Oak Streets, Ms. Field noticed a man standing on the corner. She described him as a black male with a dark complexion, approximately five feet eight inches to five feet ten inches tall, about 160 pounds, and with shoulder length hair in Jerri curls. The man was wearing a black baseball cap, a tan jacket with a band around the collar and an elastic waistband, and a beaded necklace tied in "a knot or an X at the bottom." Ms. Field waved for the man to cross the street, but he signaled her to continue through the intersection. As Ms. Field drove down the hill, she looked in her rearview mirror and saw a person walking though the headlights of Ms. Kindermann's car. Once she turned the corner, Ms. Field could no longer see the intersection where Ms. Kindermann's car was stopped.

Ms. Field finished driving the twelve blocks to her house. Ms. Kindermann was no longer directly behind her, but Ms. Field assumed she was following, so she went inside and started getting ready for bed. When Ms. Kindermann failed to arrive at the house for some minutes, Ms. Field became worried and called Mr. McKim to see if Ms. Kindermann had returned to his house. When told that Ms. Kindermann was not there, Ms. Field drove around the area looking for her, without success. Ms. Field again called Mr. McKim, but he still had not heard from Ms. Kindermann. Ms. Field then drove to Ms. Kindermann's father's house in Overland Park, Kansas, to look for Ms. Kindermann, but she was not there. Ms. Field went home and called Mr. McKim a third time looking for Ms. Kindermann, but to no avail. Eventually, Ms. Field called the police. She was told to call back later, and after calling a second time, Ms. Field went to the police station to make a report.

Sometime after dawn that morning, Brenda Canady, who lived at 5240 Olive Street, noticed a car with out-of-state license plates parked in the alley near her home when she left to take her husband to work. When she returned home about twenty minutes later, the car was still in the alley, so Ms. Canady decided to call the police to report it as stolen. Approaching the car, she saw what she believed was a pile of clothing lying to the left of the car. As she got nearer, she realized that it was a blood-covered body. She ran back to her house and called the police.

The police arrived and determined that the car in the alley was registered to Ms. Kindermann. Ms. Kindermann's body had five gunshot wounds and was found not far from the car. She was not wearing her blouse, and her jeans were unzipped and missing a button. Police also found a baseball cap, cigarette butts, and four nine millimeter shell casings at the crime scene. Vaginal swabs taken from the victim's body revealed the presence of spermatozoa.

On November 24, 1992, the TIPS hotline received an anonymous phone call that Steven Love had been involved in the murder. For various reasons, police did not investigate this tip until several months later. At that point, Mr. Love came to police headquarters for an interview. He first told police that he had never seen Ms. Kindermann before and had never been to the place where her body was found. The police obtained a sample of Mr. Love's hair so they could eliminate him as a suspect. Mr. Love subsequently told police that he had been to the place where Ms. Kindermann's body was found. He also stated that he "knew all about the homicide" but did not want to say anything. Officers placed Mr. Love under arrest and obtained a sample of his blood. Police also obtained a photograph of Mr. Love wearing a necklace with a large medallion pendant.

Ms. Field told police that the pendant in the photograph looked similar to the pendant she saw on the man at the intersection on the night of Ms. Kindermann's murder. DNA testing revealed that the sperm samples taken from the victim's body, as well as saliva found on one of the cigarette butts, matched Mr. Love's DNA. Testing also revealed that hair recovered from the baseball cap found at the scene was indistinguishable from Mr. Love's hair.

Mr. Love was charged by indictment with first degree murder, forcible rape, kidnapping, and three counts of armed criminal action. The jury convicted Mr. Love on all counts. The trial judge sentenced Mr. Love to consecutive terms of life without the possibility of parole for first degree murder, life for rape, fifteen years for kidnapping, and life for each count of armed criminal action. Mr. Love filed a timely notice of appeal.

Mr. Love subsequently filed a *pro se* Rule 29.15 motion for post-conviction relief. Appointed counsel filed an amended motion alleging that Mr. Love's trial counsel was ineffective in, *inter alia*, failing to object to Detective George Barrios's testimony regarding the anonymous phone call implicating Mr. Love and in failing to object when the prosecutor mentioned this call during closing argument. The motion court denied Mr. Love's motion without an evidentiary hearing. Mr. Love also appeals this ruling.

## II. ADMISSIBILITY OF DNA EXHIBITS

As his first point on appeal, Mr. Love claims that the trial court abused its discretion in excluding graphs prepared by his expert witness, Dr. Diane Lavett, and in prohibiting Dr. Lavett from testifying regarding these exhibits. The graphs depicted Dr. Lavett's use of a type of light meter called a "densitometer" to measure autoradiograms. Autoradiograms are pieces of x-ray film that have been exposed to radioactive DNA and represent the location of particular portions of DNA. Dr. Lavett attempted to use her graphs to explain her belief that Mr. Love's DNA did not match the DNA obtained from the victim.

The admissibility of expert testimony is left to the sound discretion of the trial court and will not be reversed on appeal unless there is a clear abuse of discretion. *State v. Davis*, 814 S.W.2d 593, 603 (Mo. banc 1991), *cert. denied*, 502 U.S. 1047, 112 S.Ct.

911; 116 L.Ed.2d 812 (1992); *State v. Sloan,* 912 S.W.2d 592, 596 (Mo.App.1995). The trial court abuses its discretion only when its ruling is "clearly against the logic of the circumstances or when it is arbitrary and unreasonable." *State v. Williams,* 828 S.W.2d 894, 899 (Mo.App.1992) (*quoting State v. Corpier,* 793 S.W.2d 430, 441 (Mo. App.1990)).

Prior to Dr. Lavett's testimony, the State filed a motion to conduct a voir dire examination of the doctor. After preliminary questioning by defense counsel to establish Dr. Lavett's qualifications, the State cross-examined her. At the conclusion of this cross-examination, the State asked the court to preclude Dr. Lavett from testifying regarding any forensic testing of DNA samples because she had no forensic experience. Defense counsel argued that this should go to the weight and not the admissibility of her testimony.

The trial judge ruled that Dr. Lavett was not qualified to testify in the area of forensic work and should not be allowed to criticize the lab work done by the State's experts, but stated he would not prohibit Dr. Lavett from giving other testimony about her DNA analysis at that point, and would consider the State's objection to this other testimony when he knew exactly what kind of testimony Dr. Lavett was going to give in light of his rulings.

Dr. Lavett then proceeded to testify before the jury. The State repeatedly objected during the course of Dr. Lavett's testimony. When Dr. Lavett began explaining the phenomenon known as band shifting, the State objected that she was testifying regarding the results of forensic DNA testing. The court sustained that objection based on its earlier decision that she was not qualified to testify in the area of forensic work. When Dr. Lavett subsequently began to testify that band shifting occurred in both research science and forensic science, the State again objected. After extensive discussions at the bench, the trial court again sustained the objection on the basis that Dr. Lavett lacked any forensic experience.

Dr. Lavett later began to testify that she used a densitometer to measure autoradio-grams. The State objected on the ground that Dr. Lavett did not have the required expertise or experience to testify in this area because she had never used a densitometer in a forensic setting. The State pointed out that forensic labs use densitometers in a different way than Dr. Lavett had used them. Defense counsel argued that this also went to the weight of Dr. Lavett's testimony, not its admissibility. Again, there were extensive discussions at the bench. The judge reiterated that Dr. Lavett was not qualified to critique the results of the crime lab and sustained the State's objection.

When the proceedings returned to open court and Dr. Lavett began discussing her use of a densitometer to measure autoradio-grams, the State objected and more discussions were conducted at the bench. Although still convinced that Dr. Lavett was not qualified to discuss forensic issues, the judge eventually ruled he would allow Dr. Lavett to testify as to her criticisms of the State's forensic laboratory results because she was the defense's only DNA expert and the judge believed that the prosecutor should have alerted the defense before trial that the State planned to attack Dr. Lavett's expertise. In these circumstances, the judge ruled he would permit limited testimony by Dr. Lavett criticizing the State's tests, for "to do otherwise is going to deprive the defendant of an expert witness in this case they have been counting on."

Dr. Lavett continued testifying and admitted that forensic laboratories use densitometers in a different way then she had done. When she referred to her graphical representations, the State objected to their admission as exhibits. The Court sustained the objection, and defense counsel then made an offer of proof in which Dr. Lavett explained that forensic laboratories use a computer in conjunction with a densitometer to read two autoradiograms together and compare their characteristics, while she manually used a densitometer to scan each autoradiogram separately and then compared her separate results. Dr. Lavett then produced a series of tracings of the peaks on the autoradio-grams. Based on these graphs, Dr. Lavett

concluded that Mr. Love was not a match with the DNA obtained from the crime scene.

At the end of the offer of proof, the State objected to the admission of the exhibits, noting numerous problems with Dr. Lavett's methodology. The judge sustained the objection and refused to admit the graphs on the basis that they were confusing as well as "distracting and misleading." The judge did permit Dr. Lavett to continue to testify as to her opinion concerning the autoradiograms and concerning the conclusions offered by the State's expert witnesses. Mr. Love now claims that the trial court abused its discretion in excluding the graphs and testimony related to them.

■ Expert testimony is admissible on subjects about which the jurors lack experience or knowledge, but expert testimony should be excluded if it does not assist the jury or if it unnecessarily diverts the jury's attention from the relevant issues. *State v. Lawhorn,* 762 S.W.2d 820, 822–23 (Mo. banc 1988); *State v. Taylor,* 663 S.W.2d 235, 239 (Mo. banc 1984); *Sloan,* 912 S.W.2d at 596; *State v. Gola,* 870 S.W.2d 861, 864 (Mo.App. 1993).

■ DNA evidence certainly qualifies as a subject about which the jury would lack experience or knowledge and is, therefore, an appropriate area for expert testimony. Whether a witness is qualified as an expert is a matter for the trial judge in the first instance. *State v. Futo,* 932 S.W.2d 808 (Mo. App.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 1313, 137 L.Ed.2d 476 (1997); *State v. Hoff,* 904 S.W.2d 56, 58 (Mo.App.1995); *State v. Seddens,* 878 S.W.2d 89, 92 (Mo.App.1994). The test of whether a witness is qualified as an expert is whether the witness has knowledge or skill from education or experience that will aid the trier of fact. *Id.* If a witness is not qualified, by either education or experience, as an expert in the area in which the expert proposes to testify, then the expert's testimony will not assist the jury and therefore may be excluded, however expert the proposed witness may be in other areas.

■ Here, it would have been within the trial court's discretion to entirely exclude Dr. Lavett's testimony as it related to the State's forensic analysis because the trial court concluded that Dr. Lavett was not qualified to testify as an expert on that subject. Dr. Lavett admitted that she was not a forensic scientist and had no forensic experience or education. During voir dire examination by the State, Dr. Lavett testified that she had never performed DNA testing in a forensic setting and had never conducted tests on unknown samples to obtain DNA results. Dr. Lavett also admitted that she had never produced an autoradiogram in a forensic setting.

In light of this evidence, it is difficult to say that the trial judge abused its discretion in holding that Dr. Lavett's education in the fields biology and genetics, and her experience in other aspects of DNA analysis, did not qualify her to testify as an expert in the area of forensic methodology, given her acknowledgment that she lacked either education or experience in the work of forensic laboratories. Even assuming Dr. Lavett was minimally qualified to testify in this area, however, the trial judge acted within his discretion in limiting her testimony and in prohibiting her from introducing the graphs she had produced using her unique method of DNA analysis. After considering extensive testimony concerning Dr. Lavett's methodology, the trial judge ruled that Dr. Lavett's graphs would be excluded because they were distracting, misleading, and confusing. Evidence which is confusing, distracting or misleading will not aid the jury and thus is properly excludable. *Lawhorn,* 762 S.W.2d at 820; *Taylor,* 663 S.W.2d at 239.

Defense counsel notes that the judge did not specifically state what aspects of the exhibits he found confusing or misleading. He was not required to do so. In any event, it is evident from the context of the ruling that the court found them confusing and misleading because they were produced by a methodology which was apparently unique to Ms. Lavett and which was not generally accepted in the field of DNA analysis.

To determine the admissibility of expert testimony, Missouri applies the test formulated in *Frye v. United States,* 293 F. 1013

(D.C.Cir.1923).[1] Under that test, the results of scientific procedures may be admitted only if the procedure is "sufficiently established to have gained general acceptance in the particular field to which it belongs." *State v. Kinder,* 942 S.W.2d 313, 326 (Mo. banc 1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 149, —— L.Ed.2d —— (1997); *State v. Richardson,* 923 S.W.2d 301, 329 (Mo. banc), *cert. denied,* —— U.S. ——, 117 S.Ct. 403, 136 L.Ed.2d 317 (1996); *State v. Davis,* 814 S.W.2d 593, 600 (Mo. banc 1991), *cert. denied,* 502 U.S. 1047, 112 S.Ct. 911, 116 L.Ed.2d 812 (1992). Dr. Lavett herself admitted that the type of analysis she conducted was not used in forensic laboratories, but claimed they only used densitometers in a different way. Dr. Lavett manually used a densitometer to read the autoradiograms, while forensic laboratories use a computer to scan the autoradiograms.

We find that the fact that Dr. Lavett used a methodology not generally accepted in the field of forensic science affects the admissibility of her testimony. "The *Frye* rule clearly deals with admissibility rather than submissibility." *Callahan v. Cardinal Glennon Hosp.,* 863 S.W.2d 852, 860 (Mo. banc 1993). A scientific test generally recognized for use in one area is not necessarily proper for use in another. *State v. Stout,* 478 S.W.2d 368 (Mo.1972). In *Stout,* the Missouri Supreme Court held that although neuron activation analysis was a generally accepted technique for chemical analysis of hair samples,[2] that was not sufficient to make the technique generally accepted for the analysis of blood. 478 S.W.2d at 371.

Here, the evidence was that Dr. Lavett used the densitometer in a different way and for a different purpose than did forensic scientists. She did not testify that her method was generally accepted in the field, and, in fact, the record makes clear that her methodology is generally criticized in the field. Under *Frye,* the trial court would have been within its discretion in excluding Dr. Lavett's testimony on this subject entirely. It acted well within its discretion in limiting her testimony as it did.

## III. CROSS–EXAMINATION OF DR. LAVETT REGARDING HER INCOME FROM TESTIFYING FOR PLAINTIFFS

In his second point on appeal, Mr. Love asserts that the trial court abused its discretion in allowing the State to cross-examine Dr. Lavett regarding the compensation she received for providing expert testimony in other cases and in admitting as exhibits bills tendered by Dr. Lavett for this service. Mr. Love claims that this cross-examination was prejudicial because it was not probative of any purported interest or bias Dr. Lavett had in this case.

During cross-examination, the prosecutor asked Dr. Lavett if she remembered how much she earned for testifying in a prior Missouri case called State versus Kinder. When Dr. Lavett answered that she did not remember, the State attempted to introduce Dr. Lavett's bill for that case. Defense counsel objected on the ground that the information was irrelevant, and the trial judge sustained the objection. The prosecutor then asked Dr. Lavett how much money she made in 1994 from testifying. Dr. Lavett said that approximately thirty percent of her 1994 income came from "legal work," but that she did not know the exact amount of money she earned. When the prosecutor asked Dr. Lavett how much money she earned in 1992 and 1993 from testifying, Dr. Lavett again claimed not to know.

---

1. The Missouri Supreme Court appears to have first applied *Frye* in a criminal case in *State v. Stout,* 478 S.W.2d 368 (Mo.1972), and first adopted the *Frye* test for civil cases in *Alsbach v. Bader,* 700 S.W.2d 823 (Mo. Banc 1985). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court of the United States recently held that Federal Rule of Evidence 702 supersedes the *Frye* test and that general acceptance in the scientific community is simply one, albeit a key, factor to consider in determining admissibility. The Missouri Supreme Court has yet to decide whether Section 465.065, governing the admission of expert testimony, supersedes

the *Frye* test in a similar way under Missouri law. *See Callahan v. Cardinal Glennon Hosp.,* 863 S.W.2d 852 (Mo. Banc 1993); *Schumann v. Missouri Highway & Transp. Comm'n,* 912 S.W.2d 548 (Mo.App.1995). In any event, the statute, by its own terms, applies only to civil cases. For these reasons, our appellate courts, while acknowledging *Daubert,* have continued to apply the *Frye* test. *See, e.g., State v. Davis,* 860 S.W.2d 369 (Mo.App.1993).

2. *State v. Stevens,* 467 S.W.2d 10 (Mo.), *cert. denied,* 404 U.S. 994, 92 S.Ct. 531, 30 L.Ed.2d 546 (1971).

The State, therefore, asked the court for permission to question Dr. Lavett regarding her individual bills. Defense counsel objected, but the trial court overruled the objection. The prosecutor then asked Dr. Lavett the amount she had billed for testifying in various prior cases and showed her copies of her bills. After the State asked about several cases, defense counsel again objected that the information was irrelevant, but the trial court overruled the objection. At the end of this questioning, over objection, the State's copies of Dr. Lavett's bills were received as exhibits. The State then pointed out that Dr. Lavett earned approximately $49,000 from testifying for the defense in six cases from late 1991 through July 1993.

Defendant now urges that admission of evidence regarding Dr. Lavett's prior testimony and the amounts she charged therefore was reversible error. In support, he notes that *Elam v. Alcolac, Inc.*, 765 S.W.2d 42, 199 (Mo.App.1988), *cert. denied*, 493 U.S. 817, 110 S.Ct. 69, 107 L.Ed.2d 36 (1989), stated the general rule that a witness may be questioned about the amount he or she receives for testifying in a case, but the witness may not be cross-examined as to the compensation received in other cases "unless that bears materially on the interest of the witness in the case in litigation." *See also* 31A Am.Jur.2d *Expert and Opinion Evidence* § 96 (1989). Defendant argues the state did not show that the amount Ms. Lavett received in compensation in other cases bore materially on the interest of the witness in the case at bar, and thus this type of impeachment evidence should not have been admitted.

We disagree. A number of prior cases have recognized the principle that evidence that an expert witness makes a significant part of the witness's living by testifying, or that the witness generally testifies for one side only, bears materially on the witness's credibility and hence is appropriate impeachment evidence.

For example, in *State ex rel. Creighton v. Jackson*, 879 S.W.2d 639 (Mo.App.1994), the plaintiff had brought a products liability suit against a company and designated a professional mechanical engineer as an expert witness. The defendant served the expert with a subpoena duces tecum requesting portions of his tax returns for the past five years reflecting the expert's income from being a consultant or witness. The defendant presented evidence that the expert in question made his living as a consultant and a witness. The defendant also presented the deposition from a previous case in which the expert claimed that he could not estimate his earnings from testifying. The trial court found that the expert had been "less than forthcoming" and ruled that the expert was required to appear and produce the documents. The expert sought a writ of prohibition from this Court.

We held that the defendant was entitled to discover information relating to the expert witness's income from consulting and testifying in prior cases, stating:

We cannot say that the trial court finding was arbitrary and unreasonable. This court observes that most people are generally able to articulate something about their earnings in their various business and professional endeavors. The trial court could reasonably have concluded that the sincerity of Dr. Creighton's lack of memory was suspect. The court could reasonably have anticipated that Dr. Creighton will attempt to evade such inquiries if put to him in the absence of any documentation to which reference may be made.

*Id.*

Similarly, in *State ex rel. Lichtor v. Clark*, 845 S.W.2d 55 (Mo.App.1992), the plaintiff served a subpoena duces tecum on the defendant's expert seeking financial records of his bills for consultation and testimony. In ruling on the expert's request for a writ of prohibition, this court noted that federal cases have held that an expert could be cross-examined about fees earned in other cases. *Id.* at 65, *citing, Collins v. Wayne Corp.*, 621 F.2d 777 (5th Cir.1980). We then stated, "We hold also that the trial judge in this case has discretion to allow testimony as to the amount of annual income derived from employment as an expert witness." *Id.*, 845 S.W.2d at 65, *citing, Trower v. Jones*, 121 Ill.2d 211, 117 Ill.Dec. 136, 520 N.E.2d 297 (1988). Our rationale was that "[e]vidence that a witness makes substantial income from testifying ... does illuminate the financial

interest the expert has in giving such testimony." *Id.*

Here, as in the above cases, we hold that the trial court did not abuse its discretion in allowing the cross-examination of the expert regarding the money the expert had earned from testifying in prior cases. Dr. Lavett claimed to not be able to remember how much money she made in a year from testifying as an expert. *Creighton* indicates that in this situation documents proving how much the expert earned should be admissible to impeach the expert's testimony that he or she can not remember how much they have earned from giving expert testimony. Similarly, *Lichtor* indicates that the trial court has discretion to permit cross-examination in this area because it shows the financial interest of the witness in testifying. The State acted properly in asking Dr. Lavett how much of her annual income was derived from testifying in an attempt to show that a substantial portion of her income came from testifying and that she was not objective. When she denied knowledge of the answers to the State's questions, the trial court acted within its discretion in permitting the State to cross-examine her based on bills she had sent for prior cases in which she had testified over the prior eighteen months.

## IV. CREDIBILITY OF DEFENSE EXPERT

Next, Mr. Love claims that the trial court erred in allowing the State's expert, Dr. Harold Deadman, to testify regarding the credibility of Mr. Love's expert witnesses, Dr. Lavett and Dr. Martin Shapiro. Mr. Love argues that this testimony invaded the province of the jury and was prejudicial to his defense.

During its rebuttal, the State called Dr. Harold Deadman, a special agent at the FBI. The Prosecutor asked Dr. Deadman if he knew Dr. Lavett. Dr. Deadman responded that Dr. Lavett had testified for the defense in five prior cases in which he had testified for the prosecution. Dr. Deadman also testified that he was familiar with her testimony and reports. Dr. Deadman then stated:

> I would say Dr. Lavett's testimony and her writings that I am aware of that pertain to forensic DNA analysis are for the most

part wrong and for the most part a misrepresentation of the truth. She presents a very distorted view of the field of forensic DNA analysis, and she has provided little, if any, documentation or evidence to support her conclusions in the cases in which she has testified.

Defense counsel made no objection to Dr. Deadman's testimony regarding Dr. Lavett.

The prosecutor then asked Dr. Deadman if he was familiar with Dr. Martin Shapiro, who was also an expert witness for the defense. When the prosecutor asked Dr. Deadman to comment on Dr. Shapiro's conclusions, defense counsel objected on the basis of relevance and speculation. The trial judge overruled this objection. Dr. Deadman then stated:

> I would say basically the same thing about Dr. Shapiro's testimony and his writings as I said about Dr. Lavett, that for the most part he is wrong. His one paper that he produced confused the measurement uncertainty when DNA bands are measured with the independence question. He is claiming that there is a dependence in the measurement uncertainty on bands that are measured, and he's claiming that that means that the bands themselves are not independent. That is entirely wrong. There's no evidence to support that he is correct, and there have been rebuttal articles written in response to Dr. Shapiro's article.

Again, defense counsel made no objection that this was an improper subject for expert testimony or that it invaded the province of the jury.

■ Now, for the first time on appeal, Mr. Love argues that it was error to admit this testimony by Dr. Deadman. In support, he correctly points out that expert testimony is not admissible if it relates to the credibility of witnesses, because this invades the province of the jury. *State v. Whitmill,* 780 S.W.2d 45, 47 (Mo. banc 1989); *Lawhorn,* 762 S.W.2d at 823; *Sloan,* 912 S.W.2d at 596.

■ Because Mr. Love failed to object to this testimony at trial and raises this point for the first time on appeal, we review only for plain error. *State v. Gray,* 887 S.W.2d 369, 387 (Mo. banc 1994), *cert. denied,* 514 U.S. 1042, 115 S.Ct. 1414, 131 L.Ed.2d 299

(1995). To be entitled to relief under the plain error rule, the defendant must show that the error affected his rights so substantially that a miscarriage of justice or manifest injustice would occur if the error is not corrected. *State v. Silvey*, 894 S.W.2d 662, 671 (Mo. banc 1995). Manifest injustice depends on the facts and circumstances of the particular case, and the defendant bears the burden of establishing manifest injustice amounting to plain error. *State v. Zindel*, 918 S.W.2d 239, 241 (Mo. banc 1996). The assertion of plain error places a much greater burden on a defendant than if the defendant had preserved the issue at trial. *State v. Bradshaw*, 845 S.W.2d 143, 144 (Mo.App. 1993).

■■■ We find no miscarriage of justice or manifest injustice here. In context, it is evident that Dr. Deadman was attempting to explain that Dr. Lavett's testimony was not accurate when he said that the analysis was wrong and for the most part a misrepresentation of the truth. He meant that Dr. Lavett's explanation distorted the proper method of DNA analysis, as he clarified in the sentence immediately following the one now objected to. It is permissible for an expert to testify that he disagrees with the scientific conclusion reached by another expert. *Stone v. City of Columbia*, 885 S.W.2d 744, 747 (Mo.App.1994). We see no plain error affecting Mr. Love's rights so substantially that it amounts to a miscarriage of justice.

## V. CROSS–EXAMINATION FROM LETTER IN JOURNAL

Next, Mr. Love argues that the trial court erred in allowing the State to cross-examine Dr. Lavett by reading portions of a journal article that criticized her work. Mr. Love asserts that there was no foundation for the impeachment because no expert witness adopted the letter as being authoritative and the letter was hearsay.

On direct examination by defense counsel, Dr. Lavett testified that she wrote a letter to the editor in the Journal of Forensic Sciences entitled "Misuse of Genetic Analysis in Forensic Science." She further testified during direct examination by defense counsel that Dr. George Sensabaugh had responded to her letter with a letter that was "highly critical" of what she had written. During the State's cross-examination of Dr. Lavett, the prosecutor then asked her about Dr. Sensabaugh's response to her letter, stating:

Q: Do you recall in his response to "The Misapplication of Genetic Analysis in Forensic Science" him saying the following? ... Dr. Lavett's letter, "The Misapplication of Genetic Analysis in Forensic Science," presents a naive, often erroneous characterization of genetic typing analysis in both the research and forensic science.

. . . .

Lavett fares no better in discussing the ABO antigens. Her discussion not only contains misleading statements, it also reveals near total ignorance of ABO testing method in the crime laboratory.

. . . .

The final paragraph shows that Lavett has missed or ignored the point of so much of the literature she cites. In summary, Lavett has through naivete or distortion or both generated a fictitious caricature of the practice of forensic serology.

Again, Mr. Love did not object to this questioning at trial and raises the point for the first time on appeal. Therefore, we review only for plain error. *Gray*, 887 S.W.2d at 387.

■■■ Mr. Love correctly asserts that scientific texts can be used in the examination of an expert witness only if they are authoritative. *Grippe v. Momtazee*, 705 S.W.2d 551, 556 (Mo.App.1986). To be established as authoritative, there must be evidence the text is generally accepted and accredited in the profession; the witness's mere familiarity with the text is not sufficient. *Id.* Particularly with regard to articles in journals, there must be a showing that the article is generally accepted and accredited because articles do not carry the same level of reliability as a standard text. *Grippe*, 705 S.W.2d at 556–57. Articles in medical journals are not admissible as independent, substantive evidence. Rather, they are used to test the knowledge of the expert and the reliability of her opinion. *Wilson v. ANR Freight Systems, Inc.*, 892 S.W.2d 658, 664 (Mo.App.1994).

The State claims that these rules do not apply here because the prosecutor was not trying to impeach Dr. Lavett by cross-examining her on the basis of an authoritative text. Instead, the State claims, the prosecutor was "merely inquiring concerning a subject that Dr. Lavett had brought out on direct examination." Although Dr. Lavett did first mention this subject on direct examination, it seems obvious that the State was trying to impeach Dr. Lavett's credibility by establishing that other experts criticized her work. This is improper if the text is not first shown to be authoritative. Here, however, we find no manifest injustice resulted from the State's comments about Dr. Sensabaugh's criticisms of Dr. Lavett's work, for defense counsel had already brought out the fact that Dr. Sensabaugh had written a letter which was "highly critical" of Dr. Lavett's letter. The prosecutor simply followed up with a more detailed question on these same issues. In these circumstances, although the prosecutor should have first asked for a concession from Dr. Lavett that the journal was authoritative and Dr. Sensabaugh was recognized as an expert, no manifest injustice resulted from the testimony at issue.

## VI. SUFFICIENCY OF THE EVIDENCE

As his final claim of error on direct appeal, Mr. Love claims that the evidence was not sufficient to find him guilty beyond a reasonable doubt of the crimes of kidnapping, forcible rape, first degree murder, and armed criminal action. Mr. Love points out that there was no direct evidence that he was the one who kidnapped Ms. Kindermann, that he did so by forcible compulsion, that he had intercourse with her, or that he actually murdered her.

There was more than adequate circumstantial evidence to support each element of the crimes submitted. The physical evidence showed that Ms. Kindermann had been forcibly raped and killed, and the circumstances of her sudden disappearance and later location and death supported the finding of kidnapping. The presence of Mr. Love's sperm and hair, the evidence that he matched the physical description of and wore a pendant like that worn by the person seen at the time the victim disappeared, and the fact that he offered inconsistent stories and explanations of his actions provided a more than adequate basis for the verdict.

## VII. TRIAL COUNSEL'S FAILURE TO OBJECT TO TESTIMONY REGARDING HOTLINE CALL

Mr. Love also claims that the motion court erred in denying his Rule 29.15 motion for post-conviction relief without an evidentiary hearing. Mr. Love argues that his trial counsel was ineffective in failing to object to improper testimony and closing argument regarding a call to a TIPS hotline.

Appellate review of denial of a Rule 29.15 motion for post-conviction relief is limited to a determination of whether the motion court's findings of fact and conclusions of law were clearly erroneous. Rule 29.15(k); *State v. Driver*, 912 S.W.2d 52, 54 (Mo. banc 1995). Findings and conclusions are clearly erroneous only if, after a review of the entire record, we are left with the definite and firm impression that a mistake has been made. *State v. Storey*, 901 S.W.2d 886, 893 (Mo. banc 1995).

During redirect examination, Detective George Barrios testified that on November 24, 1992, the TIPS hotline received an anonymous telephone call. The caller stated that Mr. Love had admitted shooting a woman at 53rd and Brooklyn Streets and that he carried a nine millimeter hand gun. Defense counsel made no objection to this testimony at trial. During closing argument, the prosecutor again referred to this anonymous call, pointing out that the caller said Mr. Love carried a nine millimeter hand gun, Ms. Kindermann was killed with a nine millimeter gun, and shell casings from a nine millimeter gun were found at the scene. Again, no objection was made to this closing argument.

Mr. Love now claims, however, that Detective Barrios's testimony was hearsay which violated his rights to confrontation and cross-examination of witnesses against him. Mr. Love further argues that his defense counsel should have objected during closing argument because the prosecutor was attempting

to use the call as evidence of Mr. Love's guilt.

To prove a claim of ineffective assistance of counsel, Mr. Love must show by a preponderance of the evidence that his attorney failed to exercise the customary skill and diligence that a reasonably competent attorney would have exhibited under the same or similar circumstances and that he was thereby prejudiced. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To show prejudice, Mr. Love must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.*

Here, Mr. Love has failed to meet his burden to show that his trial counsel was ineffective. The errors he alleges made his counsel incompetent were not preserved. A defendant cannot "convert unpreserved error into viable error by arguing incompetence." *Jones v. State,* 784 S.W.2d 789, 793 (Mo. banc), *cert. denied,* 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 175 (1990). The decision of whether to object is a strategic decision left to the judgment of trial counsel. *State v. Suarez,* 867 S.W.2d 583, 587 (Mo.App.1993).

In any event, Mr. Love recognizes that the general nature of the phone call was admissible to show why the police contacted Mr. Love. *State v. Dunn,* 817 S.W.2d 241, 243 (Mo. banc 1991), *cert. denied,* 503 U.S. 992, 112 S.Ct. 1689, 118 L.Ed.2d 403 (1992) ("[S]tatments made by out-of-court declarants that explain subsequent police conduct are admissible."). Instead, he claims that it was unnecessary to explain the details of the call. During direct examination, Detective Barrios said only that the police had received information indicating that Mr. Love may have been involved in Ms. Kindermann's death. No further reference was made to any anonymous phone call. On cross-examination, defense counsel went into great detail about a previous anonymous phone call, which indicated that another man had committed the murder. Defense counsel was trying to cast doubt on Mr. Love's guilt by showing that police had a tip that someone else may have committed the crime. Therefore, on redirect examination, it was proper for the State to show that the call implicating Mr. Love was equally as detailed as the previous call. *State v. Lingar,* 726 S.W.2d 728, 734 (Mo. banc), *cert. denied,* 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987). Once this testimony was in the case, it was not ineffective assistance for defense counsel not to object to argument about it.

For all of these reasons, we affirm the conviction and the denial of Mr. Love's motion for post-conviction relief.

All concur.