**STATE of Missouri, Respondent,**

**v.**

**David B. DEWEY, Appellant.**

**No. WD 60395.**

Missouri Court of Appeals,
Western District.

Submitted Sept. 5, 2002.

Oct. 15, 2002.

Emmett D. Queener, Assistant Public Defender, Columbia, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., and Dora A. Fichter, Asst. Attorney General, Jefferson City, MO, for respondent.

Before HAROLD L. LOWENSTEIN, P.J., JAMES M. SMART, JR., and THOMAS H. NEWTON, JJ.

JAMES M. SMART, JR., Judge.

David Dewey appeals his conviction of second degree murder. He raises evidentiary issues in his appeal, including a contention that the court erred in permitting the prosecutor to testify as an expert witness as to a diagnosis of the accused's mental condition. Because we determine that there is no ground for reversing the conviction, we affirm the judgment of conviction.

## Statement of Facts

On an appeal of a criminal conviction, we present the facts in the light most favorable to the verdict. *State v. Goodwin,* 43 S.W.3d 805, 809 (Mo. banc 2001).

Sheena McDonald, a twelve-year-old girl, lived in the Gregory Heights subdivision near Columbia, Missouri. She went for a walk in the late afternoon of May 14, 2000. She did not return. Her lifeless body was found that night, next to a shed in a wooded area close to her home. Sheena had sustained injury to her face and blunt force trauma to her head. Her death was caused by strangulation due to compression of her neck.

David Dewey also lived in the Gregory Heights subdivision and was acquainted with Sheena. On the night of her death, he was fifteen years old. While canvassing the subdivision that night for information concerning Sheena, the police arrived at Dewey's home around 1:15 a.m. Dewey stated that he had seen Sheena a few days earlier but that he not seen her on the day she died. He again denied seeing her on May 14 when interviewed by an officer the next day.

On May 16, Dewey requested to speak with an officer. Dewey was in school at the time. Officer Harmon of the Columbia Police Department arrived and spoke with Dewey in the school's office. At this time, Dewey changed his story as to his actions on May 14. Dewey told Officer Harmon that on that evening he had been visiting friends in his subdivision, and he had taken a shortcut near where her body was found. Dewey denied seeing Sheena or being at the crime scene.

The next day, Dewey was taken to the Sheriff's Department for an interview with Officer Harmon. A juvenile officer and Dewey's father were present. The juvenile officer read Dewey his *Miranda* rights. He waived his rights, agreeing to speak with the officers. At first, Dewey reiterated the story that he had been near the crime scene but had not seen Sheena.

Officer Harmon informed Dewey that his story was inconsistent with information that he was receiving from others, because two people had reported seeing him going towards the crime scene near the time of Sheena's death. Officer Harmon also explained to Dewey that if he had touched Sheena, his DNA would be found on her. Dewey then changed his story again.

Dewey admitted being with Sheena when she died. He had gone down to a shed in a wooded area in the subdivision. Sheena was there, smoking. Dewey stated that he gave Sheena a hug, accidentally touching her inappropriately. Sheena slapped Dewey, and Dewey restrained her. In the resulting struggle, Dewey compressed Sheena's neck, and she suffocated. When he realized she was dead, he left her there and told no one what had happened.

Dewey was certified to stand trial as an adult and was charged with second-degree murder. Dewey's defense was that he suffered from diminished capacity, which negated the required mental state for murder. At trial he presented an expert witness, Dr. Rosalyn Schultz, a licensed psychologist trained in forensic psychology, to testify as to his mental state at the time of Sheena's murder. The jury was given the choice of acquitting Dewey or convicting him of second-degree murder, voluntary manslaughter, or involuntary manslaughter in the first or second degree. The jury found Dewey guilty of second-degree murder, and he was sentenced to twenty-seven years in prison in accordance with the jury's recommendation. Dewey now appeals.

## Alternate Diagnosis

 Dewey first argues that the trial court abused its discretion in allowing the prosecutor, in cross-examining Dr. Schultz, to ask her to consider an alternate diagnosis based on criteria delineated in the Di-

agnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM–IV"). Dewey argues that by presenting the expert witness with an alternate diagnosis, the prosecutor in effect became an expert witness against Dewey, whom Dewey did not have a chance to cross-examine.

Dewey was convicted of second-degree murder under § 565.021 RSMo. This statute requires that the State prove that Dewey "[k]nowingly cause[d] the death of another person or, with the purpose of causing serious physical injury to another person, cause[d] the death of another person." § 565.021.1(1). The trial revolved around whether Dewey had a mental disease or defect, which diminished his capacity to understand that, while struggling with Sheena, his actions could cause Sheena serious physical injury or death.

Dewey's expert, Dr. Rosalyn Schultz, had interviewed Dewey and his family members. She also had reviewed records concerning Dewey's behavioral patterns. Dr. Schultz testified that Dewey suffered from a mood disorder, specifically a major depressive disorder, and borderline personality disorder. According to Dr. Schultz, when Dewey became overwhelmed by psychological stress, he would suffer periods of time where he could not control his emotions and could not remember his actions. Dr. Schultz testified that in her opinion, at the time of Sheena's death, Dewey was experiencing an episode where he could not control his actions.

During cross-examination of Dr. Schultz, the prosecutor referred her to the DSM–IV. Dr. Schultz acknowledged the DSM–IV as being an authoritative manual of mental diseases and as being generally accepted and used by those in the mental health field. The DSM–IV lists mental diseases and also lists the diagnostic criteria for each, consisting of a list of behavioral characteristics. Dr. Schultz testified

that her diagnosis corresponded to the DSM–IV's listings for major depressive order and borderline personality disorder.

The prosecutor questioned Dr. Schultz as to whether she had also considered the diagnosis of conduct disorder, which is listed in the DSM–IV, as an appropriate diagnosis for Dewey. She stated she had not. He directed Dr. Schultz to the diagnostic criteria for conduct disorder in the DSM–IV, which were entered into evidence. The prosecutor then took the diagnostic criteria, one by one, and asked Dr. Schultz if the conduct was applicable to Dewey. To illustrate his points, he directed Dr. Schultz to information contained in documents given to Dr. Schultz for her diagnosis, such as school records and arrest records. After a considerable amount of questions on this subject were asked, the defense objected to the line of questioning on the basis that the prosecution was not qualified to offer a diagnosis. The court overruled the objection. The prosecutor continued to ask questions concerning conduct disorder, and the defense continued to object.

### Challenging the Diagnosis

Dewey now appeals, arguing that the prosecutor was, in effect, attempting to show that Dewey had conduct disorder. This, in effect, he argues, made the prosecutor an "expert witness," whom Dewey then had no chance to cross-examine. Since the defendant did not object for a substantial period of time after the line of questioning began, any error from any question presented prior to an objection was not properly preserved for review. Rule 30.20; *Goodwin,* 43 S.W.3d at 813. However, because the objection was made early enough in the cross-examination to preserve the objection as to much of the questioning, we will treat the matter as preserved.

■■■ The standard of review for preserved error in cross-examination is that of an abuse of discretion. *Goodwin,* 43 S.W.3d at 817. "[T]rial courts retain broad discretion in deciding the permissible scope of cross-examination, and an appellate court will not reverse a conviction absent an abuse of that discretion." *Id.* (citing *State v. Oates,* 12 S.W.3d 307, 313 (Mo. banc 2000)). "A trial court will be found to have abused its discretion when a ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. Johns,* 34 S.W.3d 93, 111 (Mo. banc 2000).

■■■ The scope of cross-examination is broad. "Wide latitude is afforded the cross-examination of witnesses to test qualifications, credibility, skill or knowledge, and the value and accuracy of the expert's opinion." *State v. Brooks,* 960 S.W.2d 479, 493 (Mo. banc 1997). "The sources of information used to cross-examine a witness can include hearsay and do not need to be admissible as evidence." *Id.* "Prosecutors have wide latitude in cross-examining psychological experts because the factual basis for psychiatric testimony is particularly important." *State v. Parker,* 886 S.W.2d 908, 927 (Mo. banc 1994). Prosecutors are also free to cross-examine to show lack of objectivity on the part of an expert witness. *State v. Love,* 963 S.W.2d 236, 244 (Mo.App.1997).

Dewey singles out a section of the cross-examination of Dr. Schultz and attempts to show that the prosecutor intended to provide the jury with an alternate diagnosis, conduct disorder. Dewey misses the point. Taken in context with the rest of the cross-examination, it appears that the prosecutor was simply intending to impeach the credibility of Dr. Schultz by showing that she had not adequately con-

sidered all the facts given to her when she diagnosed Dewey.

The prosecutor attacked Dr. Schultz's credibility and the value and accuracy of her opinion in many ways. Noting that she had never testified for the prosecution, while she had testified numerous times for the defense, he probed the possibility of bias favoring criminal defendants. He questioned whether her objectivity was affected by the fee she received from the Public Defender's Office to testify. He questioned whether she had adequately interviewed Dewey, since she had spent only a total of eight hours with him, the bulk of which was taken up with the administration of standardized tests to Dewey. The prosecutor questioned whether she had reviewed all the background materials provided to her, such as school records and police videotapes, because her billing records did not seem to reflect enough time to review the materials. The prosecutor questioned Dr. Schultz about the accuracy of her report because she did not write the report until almost six months after she had seen him. The prosecutor then attacked her report by attempting to show that the majority of the discovery materials provided to her were not discussed or referred to in her report.

Only after all the foregoing questioning did the prosecutor cross-examine Dr. Schultz about whether she had considered diagnoses for Dewey other than the one contained in her report. In the cross-examination, the prosecutor discussed information provided to Dr. Schultz, which she had not included in her report and which did not necessarily support her diagnosis. To make his point, the prosecutor then applied that information to another disorder contained in the DSM–IV, conduct disorder. Taken in context, the record indicates that the prosecutor was engaged in permissible impeachment of the expert witness.

 Dewey also attacks the prosecutor as to his closing argument, in which he asked the jury why the state should have to hire an expert witness to rebut Dr. Schultz's testimony. Dewey argues again that the statement shows that the prosecutor became an expert witness against him, because the prosecutor provided the jury with an alternate diagnosis. Again, he takes the statement of the prosecutor out of context. The complete statement is as follows:

> Rosalyn Schultz is, as you all I'm sure clearly saw, is basically a professional witness … She's aloof. She's condescending. She doesn't have any credibility whatsoever. And so her credibility was nil when she got off that stand. Nothing. Nothing could be believed from her. She cooked these reports so bad. Am I required to pay another professional witness to come in here and testify? Am I required to do that when we have somebody that's been proven to be so incredible, that you all shouldn't give her any consideration at all in your deliberations? I could go on talking about her lack of credibility and this report's lack of credibility for hours.

The full statement indicates that the prosecutor was not attempting to propose an alternate diagnosis but was instead attacking the credibility of Dr. Schultz. We see no abuse of discretion on the part of the trial court.

### Bad Character Evidence

 Dewey's second point is that the trial court erred in introducing evidence of past behaviors and actions. Dewey objects to the introduction of (1) statements contained in a report written by a juvenile officer about Dewey's failure to abide by expectations of his parents; (2)

information contained in school records about his discipline problems and fights; (3) statements made by Dewey about Sheena after her death; and (4) Dewey's actions at his certification hearing.[1]

Dewey argues that the evidence was merely evidence of bad character, introduced to establish his propensity towards violence and misconduct, and thus to suggest to the jury that because of his bad character, it was more likely than not that he knowingly caused Sheena's death. We disagree. While the evidence reflects on Dewey's character, that was not the basis for admission. The basis for admission was to test the knowledge of the expert witness for the basis of impeachment regarding her diagnosis.

In order to give a diagnosis, Dr. Schultz interviewed Dewey and those close to him and reviewed discovery documents. Included in the discovery documents were Dewey's school records, a report on Dewey written by a juvenile officer, videotapes and transcripts of interviews with Dewey, and letters written by Dewey after his arrest. She wrote a report, which was introduced as evidence at the trial, based on that information.

At trial, the prosecutor asked Dr. Schultz whether information contained in the discovery provided to her, and on which she purportedly made her diagnosis, was consistent with that diagnosis. Dewey now appeals the introduction of statements contained in a report written by a juvenile officer about Dewey's failure to abide by expectations of his parents, information contained in school records about his discipline problems and fights, and statements made by· Dewey about Sheena after her

death. No objection was made to the introduction of this evidence at trial, however. Consequently, the objection was not preserved. Dewey also appeals the introduction of evidence that he acted inappropriately at his certification hearing. A timely objection was made as to this evidence. His claim with respect to the evidence of his behavior is reviewable for abuse of discretion. *Goodwin*, 43 S.W.3d at 817.

It is true that "evidence of prior or uncharged misconduct is not admissible for the purpose of showing the propensity of the defendant to commit such crimes." *State v. Burns*, 978 S.W.2d 759, 761 (Mo. banc 1998). However, "[a]n expert witness may be cross-examined about facts not in evidence to test the validity of his opinion." *State v. Parker*, 886 S.W.2d 908, 927 (Mo. banc 1994). "Where a psychological expert's opinion of mental illness is before the court, the validity and weight of the opinion may be tested on cross-examination concerning the expert's knowledge of fact[s] surrounding the defendant's mental status, including the accused's past interactions that bear on the opinion." *Goodwin*, 43 S.W.3d at 817 (citing *State v. Smith*, 32 S.W.3d 532, 550 (Mo. banc 2000)). Courts should give wide latitude for cross-examination of experts to test the factual basis for the opinion given. *Parker*, 886 S.W.2d at 927.

The case of *State v. Goodwin*, 43 S.W.3d 805 (Mo. banc 2001), was another murder case in which Dr. Schultz testified. In *Goodwin*, the defendant was charged with first-degree murder. Dr. Schultz testified that the defendant lacked the mental capacity to form the specific intent to commit

---

1. In the argument section of this Point, Dewey also complains of the introduction of evidence that he had touched Sheena inappropriately in the past, that he broke into a Pizza Hut shed and urinated on plates and cups, that he stole a bobcat, and that he damaged cars. However, none of these are stated in the Point Relied On, and, thus, are not preserved for review.

murder. *Id.* at 813. At trial, the prosecution introduced evidence of prior bad acts of the defendant to test the validity of Dr. Schultz's medical opinion. *Id.* at 817. The defendant objected. On appeal, the Missouri Supreme Court stated:

> In a case such as this, where the defendant concedes killing the victim and the only issue is whether his mental state absolves him from responsibility, psychological expert testimony is particularly crucial. Here, the expert's report indicated that her opinion, given at trial, was based in part upon a lack of significant history of crimes or violence. The state was entitled to test the depth of her knowledge about that history.

*Id.*

The instant case involves not only the same issue, but also the same expert witness giving the same diagnosis. The questions presented to Dr. Schultz in this trial were, as in the *Goodwin* case, intended to test the knowledge of the expert witness about the facts she purportedly used in making a diagnosis. Also, the questions were intended to test her as to whether later acts were consistent with her diagnosis. While the evidence reflected on Dewey's character, that factor does not preclude introduction of the evidence for another, legitimate purpose. *Id.*; *Smith* 32 S.W.3d at 550; *State v. Dowell*, 25 S.W.3d 594, 602 (Mo.App.2000). Questions presented to Dr. Schultz about whether she had considered information given to her in forming her diagnosis is certainly probative as to her credibility and the reliability of her report. Further questions as to whether Dewey's actions at the certification hearing were consistent with her diagnosis were also probative. The prosecution sought to impeach Dr. Schultz by showing that she failed to include in her report facts known to her that conflicted with her diagnosis. The prosecution also sought to show that there were other facts which did not support her diagnosis. Thus, we fail to discern any abuse of discretion in the admission of the evidence.

### The "Whole Truth"

Dewey's third point on appeal is that the trial court erred in allowing Detective Harmon to state that he believed Dewey never told him the "whole truth." Dewey argues that this statement invaded the province of the jury to determine the weight of the evidence and that manifest injustice will result if the error is left uncorrected.

At trial, the prosecutor asked his witness, Detective David Harmon:

> Prosecutor: ... At that point or ever did you ever believe the defendant was telling the full truth?
>
> Detective: I don't believe he was ever telling the whole, whole truth.

Dewey did not object. Since there was no objection at the introduction of this evidence, the objection was not preserved.

The detective's answer was not a comment on Dewey's general credibility, but rather was a statement that the detective believed that Dewey was not telling him everything that occurred in the incident. This was actually consistent with the position of the defense, which is that Dewey lacked awareness of all that transpired and, accordingly, would not remember everything. The State suggests that the purpose of the inquiry was to explain the course of the detective work in investigating the murder. While we are doubtful that the question and answer had any practical or probative value at all, we do not think that the question was of such a nature as to require the court to intervene, *sua sponte*, to forbid the detective's answer.

The State points out that the trial court's failure to intervene *sua sponte* could not be plain error in view of the Supreme Court's decision concerning an almost identical inquiry in *State v. Simmons*, 944 S.W.2d 165 (Mo. banc 1997), *cert. denied* 522 U.S. 953, 118 S.Ct. 376, 139 L.Ed.2d 293 (1997). In *Simmons*, during redirect, the prosecutor asked the interrogating officer: "Detective, after your investigation of this case, and knowing all the things you now know, do you believe that [the defendant] told you everything about what he did?" *Id.* at 176. In that case, the defense objected to the question. The court overruled the objection, and the officer responded, "No, I do not." *Id.* The Supreme Court held that the question and answer were not improper in that the statement focused on whether the officer believed there was more the defendant could have said in his confession, and not whether the items admitted were false. *Id.* The court noted that, in any event, the question and answer were not prejudicial to the defense.

As in *Simmons*, in this case there were plenty of other reasons for the jury to conclude that the confession did not include the whole truth, including the fact that not all of Sheena's injuries were explained in the confession and the fact that Dewey had changed his confessions several times to gradually reveal more of the facts. In any event, because the whole thrust of the defense was that Dewey lacked awareness of all of his actions at the time of Sheena's death, we discern no disadvantage to the defendant from this statement. For all of the foregoing reasons, we deny this point.

### Dewey's Letter

 Dewey's final point on appeal is that the trial court erred in not declaring a mistrial after a portion of a letter he wrote to a friend was read aloud in the presence of the jury. Dewey wrote several rather bizarre letters while he was in custody. The one in question on this point was a letter to Erika Barnhart informing her that he was going to write a letter to Sheena, the deceased victim. While Dewey did object to the evidence, he did not ask for a mistrial at that time. Thus, the question of whether a mistrial should have been granted was not preserved for appeal.

During the cross-examination of Dr. Schultz, the following exchange occurred:

Prosecution: ... [W]ould you also ... agree with me that that the defendant wrote a letter to Erika Barnhart and he said to her that, he indicated to her that he wanted to write a letter to Sheena; correct? Isn't that right?

Dr. Schultz: If that's what's stated, yes.

Prosecution: Okay. Well, do you recall him saying—

Defense: Again I'm going to object. I'm not sure what the prosecutor is getting into.

Court: Let me hear the question then I'll hear your objection.

Prosecution: Isn't it true that he wrote a letter to Erika Barnhart "[a]fter I give that letter, give you that letter to Sheena, you'll know shit my lawyer don't even know. I trust you, babe. I trust you with the info that could get me locked up for the rest of my life. Yes, the rest of my life."

Court: Just a minute. Now I'll hear your objection.

Defense: Your Honor, my objection is there is no telling at all what the prosecutor is referring to. My objection is this questioning is improper. And there's been inadequate foundation for how these letters were obtained.

Prosecution: I can lay foundation.

Court: Just a minute, Mr. Knight. Let me hear the objection, please.

Defense: The evidence is it's highly irrelevant. It's prejudicial.

Court: The objection will be sustained. Ladies and gentlemen of the jury, you will disregard counsel's last question.

Dewey now argues that the court's limiting instruction was not enough to cure the prejudice, and that the court should have, *sua sponte*, ordered a mistrial.

Under Rule 30.20, this court may evaluate whether the trial court committed plain error "affecting substantial rights resulting in manifest injustice or a miscarriage of justice." *Goodwin*, 43 S.W.3d at 813. Although the letter was incriminating, the prosecution could use it to cross-examine Dr. Schultz because it was included in the materials provided to her for her consideration in making her diagnosis. In that event, the defense might have been entitled to a limiting instruction, limiting the jury's consideration for any purpose other than testing the diagnosis. In any event, we fail to see any plain error or manifest injustice in the fact that the jury heard the excerpt from the letter in view of the fact that the letter could have been independently admitted into evidence as an admission of the defendant.

The admission of a criminal defendant is relevant and material if it tends to incriminate the defendant, to connect the defendant to a crime, or to manifest the defendant's consciousness of guilt. *State v. Isa*, 850 S.W.2d 876, 894 (Mo. banc 1993). The defendant need not expressly acknowledge his or her guilt for the statement to qualify as an admission. *State v. Bannister*, 680 S.W.2d 141, 148 (Mo. banc 1984). To determine whether the statement constitutes an admission, the statement must be viewed in light of the surrounding circumstances. *Id.*

The letter, authored by Dewey, had been intercepted by correctional officers. Because the letter was relevant in that it expressed awareness of what had transpired at Sheena's death and a consciousness of guilt, the letter was admissible. *Isa*, 850 S.W.2d at 894. The issue at trial was whether Dewey had a diminished capacity to understand that, while struggling with Sheena, his actions could cause Sheena serious physical injury or death. The statement Dewey made in the letter— "[a]fter I give that letter, give you that letter to Sheena, you'll know shit my lawyer don't even know. I trust you, babe. I trust you with the info that could get me locked up for the rest of my life. Yes, the rest of my life"—is probative on that issue and tends to incriminate Dewey.

The defense acknowledges as much in Dewey's brief:

The statements the jurors heard from the letter are especially harmful because they sound very much like a confession of guilt. The issue framed for the jurors by [Dewey's] defense was whether he had the mental capacity to be aware that his conduct was practically certain to cause Sheena's death. The letter read to the jurors suggested that [Dewey] knew more than had been told to anyone, including his own lawyer. The letter further suggested that [Dewey] was aware that if his knowledge were learned of, he could he held criminally responsible. These suggestions could have been taken by jurors as refuting the defense presented at trial.

There is no doubt that the letter, if received in evidence, would have been damaging to the defense. Here, the jury was instructed to disregard the question about the letter. It is not necessary to determine whether the jury could disregard the question, because, in any event, there can be no error, much less plain

error, in failing to grant a mistrial when the evidence could alternatively have been received in evidence as an admission of the defendant. Point IV is denied.

### Conclusion

The judgment is affirmed.

LOWENSTEIN and NEWTON, JJ., concur.